Jordan M. WILLIAMS, Defendant Below–Appellant,

v.

STATE of Delaware, Plaintiff Below–Appellee.

No. 249, 2007.

Supreme Court of Delaware.

Submitted: Sept. 3, 2008.
Decided: Dec. 2, 2008.

---

Bernard J. O'Donnell, Esquire (argued) and Robert H. Robinson, Jr., Esquire (argued), of the Office of the Public Defender, Georgetown, Delaware for appellant.

Paul R. Wallace, Esquire (argued) and Abby Adams, Esquire (argued), of the Department of Justice, Georgetown, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice.

Defendant–Appellant Jordan M. Williams appeals from his conviction of one

count of carrying a concealed deadly weapon. Williams contends that the Superior Court erred in denying his motion to suppress because the police officer did not have reasonable suspicion to stop him. We agree with the Superior Court that Williams was not seized during the initial consensual encounter. Even if he was, the stop was permissible under the community caretaker doctrine because Williams appeared to be in peril, distress, or need of assistance. As a result of the encounter, the police officer learned of outstanding warrants and the weapon was seized pursuant to a search of Williams incident to a lawful arrest. We find no merit to William's appeal and affirm.

## I.

### *Factual Background*

Corporal Shawn Brittingham of the Georgetown, Delaware Police Department noticed Williams walking along the median of Route 113 in Georgetown at approximately 3:50 a.m. on October 13, 2006. Because it was cold and windy, Officer Brittingham approached Williams to offer assistance. Officer Brittingham pulled his car up about 10 feet behind Williams and activated his strobe light. He then approached and asked Williams if he needed a ride. Williams declined, explaining that his car had broken down and that he was walking to a nearby gas station where he was going to be picked up by his mother.

Officer Brittingham testified that he did not notice anything about Williams before or after the encounter that created any suspicion that Williams was engaged in criminal activity. The officer also testified that Williams's direction of travel was con-

sistent with his explanation and that he was polite, calm, and friendly while answering questions. As a matter of routine, Officer Brittingham asked Williams for his name and date of birth, which Williams gave him.[1] After the encounter, which lasted approximately two to three minutes, Williams continued on his way. Officer Brittingham then ran the name and date of birth through his mobile computer. That search revealed that Williams had outstanding arrest warrants for unpaid traffic fines.

Acting upon the warrants, Officer Brittingham again approached Williams and asked, "You know why I am back, right?" Williams responded affirmatively, acknowledging that he had outstanding warrants. Officer Brittingham then asked Williams whether he had any weapons on his person that would be of concern. Williams voluntarily responded that he had a handgun. Officer Brittingham ordered Williams to put his hands on top of his head, searched Williams, and found a handgun positioned in Williams's waistband. Williams was charged with carrying a concealed deadly weapon.

Williams filed a motion to suppress, alleging an unlawful search and seizure in violation of his rights under 11 *Del. C.* § 1902(a), the Delaware Constitution, and the U.S. Constitution. Following an evidentiary hearing, the Superior Court denied the motion, holding that Williams was not "seized" by Officer Brittingham during the initial encounter. Williams was convicted by a jury of one count of Carrying a Concealed Deadly Weapon and sentenced. This appeal followed.

---

1. Officer Brittingham testified that the purpose behind requesting the name and date of birth for contacts was to have a reference point in case something happened to him, if a crime occurred in the area, or if there was a missing persons report or "check on the welfare" complaint out on him. Additionally, he indicated that Williams could contact him if he required any assistance.

## II.

### *Standard of Review*

 We review the grant or denial of a motion to suppress for an abuse of discretion.[2] To the extent the trial judge's decision is based on factual findings, we review for whether the trial judge abused his or her discretion in determining whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[3] To the extent that we examine the trial judge's legal conclusions, we review them *de novo* for errors in formulating or applying legal precepts.[4]

### *Williams was not seized during the initial encounter*

 Williams contends that his encounter with Officer Brittingham, which resulted in Williams's giving his name and date of birth, was an unreasonable seizure in violation of 11 *Del. C.* 1902, Article I, Section 4 of the Delaware Constitution, and the Fourth Amendment of the United States Constitution. Specifically, Williams argues that once Officer Brittingham determined that he did not need assistance, the officer no longer had any reason to detain Williams, and Officer Brittingham lacked reasonable articulable suspicion for further detention and questioning.

 The United States Supreme Court has repeatedly held that not every encounter with the police is a seizure under the Fourth Amendment.[5] Where, as here, the alleged seizure was a brief investigatory stop, the Fourth Amendment does not require that the officer have probable cause to support an arrest. Rather the officer need only possess a reasonable and articulable suspicion of criminal activity.[6] However, before we can determine whether the seizure was supported by reasonable suspicion, we must first answer the threshold inquiry of whether a seizure actually occurred.[7]

As the United States Supreme Court has explained, under the Fourth Amendment "police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' "[8] Later, as

---

**2.** *Lopez–Vazquez v. State,* 956 A.2d 1280, 1284 (Del.2008); *Culver v. State,* 956 A.2d 5, 10 (Del.2008); *Flonnory v. State,* 893 A.2d 507, 515 (Del.2006); *McAllister v. State,* 807 A.2d 1119, 1122–23 (Del.2002); *Woody v. State,* 765 A.2d 1257, 1261 (Del.2001).

**3.** *Lopez–Vazquez,* 956 A.2d at 1285; *Chavous v. State,* 953 A.2d 282, 286 n. 15 (Del.2008); *McAllister,* 807 A.2d at 1123; *Woody,* 765 A.2d at 1261.

**4.** *Lopez–Vazquez,* 956 A.2d at 1284–85; *Chavous,* 953 A.2d at 286 n. 15; *Culver,* 956 A.2d at 10; *Flonnory,* 893 A.2d at 515; *McAllister,* 807 A.2d at 1123.

**5.** *Muehler v. Mena,* 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Fourth Amend-

ment applies to the states through the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**6.** *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. Williams does not argue that the first encounter amounted to an arrest; he concedes it was a *Terry* / § 1902 investigatory stop. *See* 11 *Del. C.* § 1902 (codifying *Terry*).

**7.** *Lopez–Vazquez v. State,* 956 A.2d 1280, 1286 (Del.2008); *see Purnell v. State,* 832 A.2d 714, 719 (Del.2003) ("To determine whether the stop was proper this Court must first examine the point at which [the defendant] was stopped.");

**8.** *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (quoting *U.S. v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, Rehnquist, JJ.)).

its jurisprudence evolved, the Court indicated in *California v. Hodari D.,*[9] that this standard must be read more closely, explaining that "it states a *necessary,* but not a *sufficient,* condition for ... a seizure effected through a show of authority." The Court clarified that a seizure requires more than a mere assertion of authority, even if it would cause a reasonable person to believe that he or she was not free to leave. Instead, there must be some physical force or *submission* to the assertion of authority.[10] Consistent with this requirement, the Court has held that under the Fourth Amendment "mere police questioning does not constitute a seizure. Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual."[11]

Although we have acknowledged the parameters of the Fourth Amendment as set forth by the Supreme Court,[12] we have declined to follow *Hodari* when enforcing the protection from illegal searches and seizures afforded by the Delaware Constitution.[13] Instead, we have retained a pre-*Hodari* standard based on the articulation by the Supreme Court in *Michigan v. Chesternut.*[14] Like *Chesternut,* our standard under the Delaware Constitution focuses on the actions of the police officer and whether a reasonable person would have believed he or she was not free to ignore the police presence.[15]

 Even under this more stringent standard, "law enforcement officers are permitted to initiate contact with citizens on the street for the purpose of asking questions."[16] This type of interaction is an encounter and, if consensual, neither amounts to a seizure nor implicates the Fourth Amendment.[17] During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business. Only when the totality of the circumstances demonstrates

**9.** 499 U.S. 621, 627–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)

**10.** *Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547; *accord Jones v. State,* 745 A.2d 856, 862 (Del. 1999).

**11.** *Muehler,* 544 U.S. at 101, 125 S.Ct. 1465; *Royer,* 460 U.S. at 497–98, 103 S.Ct. 1319; *accord Ross v. State,* 925 A.2d 489, 493 (Del. 2007) (citing the portions of *Muehler* and *Terry* cited above favorably). In *Royer,* a plurality of the Court explained:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.
> *Royer,* 460 U.S. at 497–98, 103 S.Ct. 1319.

**12.** *See State v. Rollins,* 922 A.2d 379, 383 (Del.2007); *Purnell,* 832 A.2d at 719.

**13.** *See Flonnory,* 893 A.2d at 516; *Jones v. State,* 745 A.2d 856, 862 (Del.1999); *accord* DEL. CONST., art I, § 6; 11 *Del. C.* § 1902.

**14.** 486 U.S. at 573, 108 S.Ct. 1975.

**15.** *Jones v. State,* 745 A.2d 856, 862 (Del. 1999); *see Chesternut,* 486 U.S. at 573, 108 S.Ct. 1975.

**16.** *Lopez–Vazquez,* 956 A.2d at 1286 n. 5; *Ross v. State,* 925 A.2d 489, 494 (Del.2007); *Woody,* 765 A.2d at 1263 n. 3. This echoes the holdings of the United States Supreme Court in *Royer,* 460 U.S. at 497–98, 103 S.Ct. 1319, and *Muehler,* 544 U.S. at 101, 125 S.Ct. 1465.

**17.** *Lopez–Vazquez,* 956 A.2d at 1286 n. 5; *Ross,* 925 A.2d at 494; *Quarles v. State,* 696 A.2d 1334, 1337 n. 1 (Del.1997); *Woody,* 765 A.2d at 1263 n. 3.

that the police officer's actions would cause a reasonable person to believe he was not free to ignore the police presence does a consensual encounter become a seizure.[18]

Here, Williams's first encounter with Officer Brittingham was not a seizure. The officer observed Williams walking on a highway median at 3:50 a.m. in cold and windy weather. He parked his patrol car about ten feet behind Williams, activated his strobe light—not his emergency flashers—and approached Williams to ask if he needed a ride. Williams voluntarily answered Officer Brittingham's questions, including his name and date of birth. After a brief period, the encounter ended with Williams continuing to walk toward his destination.

Under the Fourth Amendment, this encounter lacked the physical force or submission to the assertion of authority to amount to a seizure. Furthermore, viewing the totality of the circumstances—Officer Brittingham's inquiry, Williams's voluntary response to questions, and the amicable end to the encounter—a reasonable person would believe he was free to ignore the police presence. Because the encounter was consensual and not a seizure; the pedigree information gathered by Officer Brittingham was obtained lawfully.[19]

### Even if there was a seizure, the community caretaker doctrine applies

Assuming *arguendo* that Officer Brittingham's encounter with Williams constituted a seizure, his actions during the initial encounter were nonetheless reasonable and valid. Although a warrantless seizure is presumed unreasonable under the Fourth Amendment, this presumption may be rebutted by showing that a specific exception to the warrant requirement applies.[20]

One exception recognized by many jurisdictions is the non-criminal, non-investigative "community caretaker" or "public safety" doctrine.[21] The doctrine stems from a recognition that "[l]ocal police have multiple responsibilities, only one of which is the enforcement of criminal law...."[22] The modern police officer is a "jack-of-all-emergencies," with "'complex

---

18. *Lopez–Vazquez*, 956 A.2d at 1286 n. 5; *Jones*, 745 A.2d at 869; *Woody*, 765 A.2d at 1263 n. 3.

19. 19 *Del. C.* § 1902 is not implicated because Officer Brittingham did not "demand" Williams's name. A "demand" implies that the encounter is not consensual and amounts to a seizure. *See Harris v. State*, 806 A.2d 119, 126 n. 20 (Del.2002) (finding that Section 1902 is a codification of the reasonable suspicion requirement for investigatory stops). Here, the encounter was consensual: Officer Brittingham asked for Williams's name and birth date, which Williams voluntarily gave. There was no demand, no stop, and thus no reasonable suspicion was required.

20. *Mason v. State*, 534 A.2d 242, 248 (Del. 1987) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); *accord Katz v. U.S.*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The exceptions include investigatory stops, warrantless arrests, searches incident to a valid arrest, seizures of items in plain view, searches and seizures justified by exigent circumstances, consent searches, searches of vehicles, inventory searches, administrative searches, and searches in which the special needs of law enforcement make the probable cause and warrant requirements impracticable. *Warrantless Searches and Seizures*, 37 GEO. L.J. ANN. REV.CRIM. PROC. 39, 40 (2008).

21. *See State v. Lovegren*, 310 Mont. 358, 51 P.3d 471, 474 (2002)

22. *State v. Acrey*, 148 Wash.2d 738, 64 P.3d 594, 599 (2003); *cf. Terry*, 392 U.S. at 13, 88 S.Ct. 1868; *Cady*, 413 U.S. at 441, 93 S.Ct. 2523.

and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' " [23] To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.

The role of police as community caretakers has long been recognized under federal law. [24] Forty years ago, in *Terry v. Ohio*, [25] the Supreme Court's seminal case on investigative stops, the Court explained that "[s]treet encounters between citizens and police officers are incredibly rich in diver-

sity.... Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." The Court further acknowledged in *Cady v. Dombrowski*, [26] that "[l]ocal police officers ... frequently ... engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

In response to this federal recognition, many jurisdictions have subsequently addressed the community caretaker doctrine, with a majority adopting some form that permits police officers to investigate situations in which a citizen may be in peril or need some type of assistance. [27] Some ju-

**23.** 3 WAYNE R. LEFAVE, SEARCH AND SEIZURE § 5.4(c) (4th ed.2004) (citing AM. BAR. ASS'N, STANDARDS FOR CRIMINAL JUSTICE §§ 1–1.1(b), 1–2.2 (2d ed.1980)); *see also Acrey*, 64 P.3d at 599 ("[M]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid.").

**24.** *See Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Terry*, 392 U.S. at 13, 88 S.Ct. 1868.

**25.** 392 U.S. at 13, 88 S.Ct. 1868.

**26.** 413 U.S. at 441, 93 S.Ct. 2523.

**27.** *See, e.g., Duck v. State*, 518 So.2d 857, 859–60 (Ala.Crim.App.1987) (recognizing assisting persons in need of aid falls within community caretaker function of police and gives officer legal right to be present in a viewpoint for plain view search); *Crauthers v. State*, 727 P.2d 9, 10–11 (Alaska Ct.App.1986) (finding requests for assistance from public fall within police officers' "community caretaker function"); *State v. Enos*, 2003 WL 549212, at *4 (Del.Super.Ct. Feb.26, 2003) (holding seizure reasonable based on officer's "objective, reasonable and articulable suspicion ... defendant was in apparent peril,

distress or need of assistance"); *People v. Luedemann*, 222 Ill.2d 530, 306 Ill.Dec. 94, 857 N.E.2d 187, 197 (2006) ("Community caretaking ... refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime [and may] uphold a search and seizure as reasonable...."); *Commonwealth v. Evans*, 436 Mass. 369, 764 N.E.2d 841, 843 (2002) (finding community caretaker function allowed trooper to investigate a vehicle parked in breakdown lane at night with blinker flashing to see if driver needed aid); *State v. Pinkham*, 565 A.2d 318, 319 (Me.1989) (recognizing a police officer's "legitimate role as a public servant to assist those in distress and to maintain and foster public safety"); *Kozak v. Comm'r of Pub. Safety*, 359 N.W.2d 625, 628 (Minn.Ct.App.1984) ("In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles."); *State v. Lovegren*, 310 Mont. 358, 51 P.3d 471 (2002) (holding officer has right to investigate if reasonable and articulable suspicion person is in need of help or in peril); *State v. Martinez*, 260 N.J.Super. 75, 615 A.2d 279, 281 (App. Div.1992) (holding investigating "abnormal" driving behavior in the middle of the night

risdictions have reasoned that this type of police contact is not a seizure;[28] while others have concluded that it constitutes a seizure, but have upheld the seizure as reasonable.[29]

■■■ We have not previously had the occasion specifically to address the effect of the community caretaker function in Delaware.[30] We agree with the majority of jurisdictions, and find, that the doctrine appropriately reflects that the role of police in Delaware is not limited to merely the detection and prevention of criminal activity, but also encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens.[31]

---

involves "community caretaker function"); *State v. Marcello*, 157 Vt. 657, 599 A.2d 357, 358 (1991) ("In some circumstances ... police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking' functions to enhance public safety."); *Barrett v. Commonwealth*, 18 Va.App. 773, 447 S.E.2d 243, 246 (1994) ("An officer who harbors a reasonable and articulable suspicion ... that a citizen is in distress or in need of assistance, may lawfully effect an appropriately brief and limited seizure for the purpose of investigating that suspicion and rendering aid."); *State v. Acrey*, 148 Wash.2d 738, 64 P.3d 594, 599 (2003) (finding public looks to police to assist in a variety of noncriminal circumstances); *Bies v. State*, 76 Wis.2d 457, 251 N.W.2d 461, 471 (1977) (finding community caretaker function is an important and essential part of the police role and justified officer's presence in the alley where he obtained reasonable suspicion); *Wilson v. State*, 874 P.2d 215 (Wyo.1994) (finding community caretaker function justified brief inquiry into defendant's condition, including name and identification).

28. *E.g. Marsh v. State*, 838 P.2d 819 (Alaska Ct.App.1992); *Thompson v. State*, 303 Ark. 407, 797 S.W.2d 450 (1990); *State v. Moore*, 609 N.W.2d 502 (Iowa 2000); *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992); *Evans*, 764 N.E.2d 841; *Kozak*, 359 N.W.2d 625; *Lovegren*, 51 P.3d 471; *Borowicz v. N.D. Dep't of Transp.*, 529 N.W.2d 186 (N.D.1995); *State v. Rinehart*, 617 N.W.2d 842 (S.D.2000); *State v. Ellenbecker*, 159 Wis.2d 91, 464 N.W.2d 427 (App.1990).

29. *E.g. Enos*, 2003 WL 549212; *Matter of Clayton*, 113 Idaho 817, 748 P.2d 401 (1988); *Luedemann*, 306 Ill.Dec. 94, 857 N.E.2d 187; *Pinkham*, 565 A.2d 318; *State v. Brunelle*, 145 N.H. 656, 766 A.2d 272 (2000); *Martinez*, 615 A.2d 279; *State v. Reynolds*, 119 N.M. 383, 890 P.2d 1315 (1995); *Barrett*, 447 S.E.2d

243; *see also* 3 LeFave, *supra* note 22, at § 7.4(f) ("If the police find a person unconscious or disoriented and incoherent in a vehicle (or find such a person elsewhere and connect him with a nearby vehicle), it is reasonable for them to enter the vehicle for the purpose of giving aid to the person in distress and of finding information bearing upon the cause of his condition.").

30. In *Guererri v. State*, 922 A.2d 403 (Del. 2007), we effectively approved of the doctrine in our explanation of the requirements for satisfying the emergency doctrine exception to the Fourth Amendment. We explained that "[u]nder the second prong of the emergency doctrine test, officers must conduct the search primarily to achieve a community caretaking function, rather than to pursue a law enforcement objective." *Id.* at 407 (citing *Cady*, 413 U.S. at 441, 93 S.Ct. 2523). Later, in *Blake v. State*, 954 A.2d 315, 319 (Del.2008), again in the context of the emergency doctrine exception, we explained that "[o]nly under certain limited circumstances are police justified 'in making a warrantless entry and conducting a search of the premises to provide aid to people or property.' One of those circumstances is the emergency doctrine exception, which does not violate the Fourth Amendment if the three-pronged test of *Guererri* is satisfied."

31. In addition to a mere license to investigate, if contraband or other evidence of crime is discovered incident to the lawful performance of an officer's duties under the community caretaker function, the officer need not ignore that which is discovered. 3 LeFave, *supra* note 22, at § 5.4(c) ("[E]vidence of crime is sometimes inadvertently come by when a person is searched for some purpose not directly tied to the objective of detecting criminal activity.... If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of

In order to balance this caretaking function with the fundamental protections guaranteed by the Delaware and United States Constitutions, we must ascertain that the encounter was part of the police officer's community caretaker function; that the officer's actions during it remained within the caretaking function; and that once the caretaking function had ceased, either the encounter was terminated, or some other justification existed for its continuance. We find that the test promulgated by the Montana Supreme Court in *State v. Lovegren*,[32] properly balances these concerns. Following an in-depth analysis of various concerns informing the community caretaker doctrine, the Supreme Court of Montana adopted the following three-part test to ensure its proper application:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating ... the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under [state law].[33]

We adopt this test to ensure that investigations conducted in Delaware under the community caretaker doctrine are reasonable.

The community caretaker doctrine has three elements. First, if there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in apparent peril, distress or need of assistance, the police officer may stop and investigate for the purpose of assisting the person. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, the caretaking function is over and any further detention constitutes an unreasonable seizure unless the officer has a warrant, or some exception to the warrant requirement applies, such as a reasonable, articulable suspicion of criminal activity.

Williams contends that even if the community caretaker doctrine applies to his initial encounter with Officer Brittingham, once he declined the proffered assistance, Officer Brittingham's caretaking function was at an end. Williams argues that by not terminating his questioning at this point, Officer Brittingham illegally detained Williams without any reasonable suspicion that he was engaged in any crim-

---

crime discovered thereby is admissible in court.") In *Cady*, the Supreme Court concluded that the warrantless search of the defendant's vehicle conducted by police officers looking for the defendant police officer's firearm, which they believed he was required to carry at all times, was "constitutionally reasonable" because it was incident to the community caretaking function of the police to protect "the safety of the general public who

might be endangered if an intruder removed a revolver from the trunk of the vehicle." Moreover, the Court found that because the search was reasonable, all evidence seized, not just the revolver, was lawfully obtained. *Cady*, 413 U.S. at 447–48, 93 S.Ct. 2523.

**32.** 310 Mont. 358, 51 P.3d 471 (2002).

**33.** *Id.* at 475–76.

inal activity.[34] Specifically, Williams argues that his name and date of birth were obtained in violation of 11 *Del. C.* § 1902.

Section 1902 provides: "A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination."[35] The General Assembly based this provision on the Uniform Arrest Act ("UAA"), which was intended to ensure that a suspect was not considered "arrested" when an officer conducted an investigation.[36] We have not previously addressed the in-

terplay between Section 1902 and the community caretaker doctrine.[37] We note, however, that several jurisdictions adopting the community caretaker doctrine also have a statute based on the UAA.[38] None of these jurisdictions have used the UAA to limit the community caretaker doctrine, which, where applicable, permits identifying the person offered aid by the police.

In *Commonwealth v. Evans*,[39] the Supreme Judicial Court of Massachusetts found that the community caretaker function allowed a trooper to approach a vehicle parked in the breakdown lane at 11:30 p.m. with its right blinker flashing. Intending to see if the defendant needed

---

**34.** Despite the widespread acceptance of the community caretaker doctrine, there remains a tension between a police officer's function as a community caretaker and the intrusion onto the privacy of individuals. Thus, the scope of any investigatory stop authorized by the doctrine must be limited to only those actions necessary to carry out the purposes of the stop, unless particularized suspicion of criminal activity or some other exception to the warrant requirement subsequently arises.

For example, in *State v. Dube*, 655 A.2d 338, 339 (Me.1995), a custodian requested that the police accompany him into the defendant's apartment to verify that he only entered to fix a leak. Once in the apartment, the officers observed evidence of child abuse and neglect in plain view. After the custodian finished his repairs and left, the officers remained to document and collect evidence of the squalid conditions. The Supreme Judicial Court of Maine held that the officers' presence in the apartment was initially lawful as part of their community caretaking functions, which were "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 340. However, the court explained that once the repairs were made and the custodian left, the officers' caretaking role was complete. Their continued presence in the apartment was unlawful unless there was some additional exception to the warrant requirement. Finding none, the court suppressed all evidence collected after the custodian left, even the photographs which recorded only

evidence that was in plain sight, because the officers were no longer lawfully present on the property at the time it was collected. *Id.* at 341.

**35.** 11 *Del. C.* § 1902(a).

**36.** Sam B. Warner, *The Uniform Arrest Act*, 28 Va. L. Rev. 315 (1942). Prof. Warner was the reporter for the Interstate Commission on Crime, which eventually drafted the Uniform Arrest Act. *Id.* at 316.

**37.** In *Rickards v. State*, 77 A.2d 199 (Del. 1950), we did not address situations where an officer approaches an individual for reasons totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

**38.** *Compare* Ark. Crim. Proc. R. 2.2 *with Allen v. State*, 1997 WL 86362 (Ark.Ct.App. Feb.26, 1997); *compare* Kan. Crim. Proc.Code. Ann. § 22–2402 *with State v. Gonzales*, 36 Kan. App.2d 446, 141 P.3d 501 (2006); *compare* Mass. Gen. Laws Ann. ch. 41 § 98 *with Commonwealth v. Evans*, 436 Mass. 369, 764 N.E.2d 841 (2002); *compare* Mont.Code Ann. § 46–50–401 *with State v. Lovegren*, 310 Mont. 358, 51 P.3d 471 (2002); *compare* N.H.Rev.Stat. Ann. § 594:2 *with State v. Brunelle*, 145 N.H. 656, 766 A.2d 272 (2000); *compare* R.I. Gen. Laws § 12–7–1 *with State v. Lombardi*, 727 A.2d 670 (R.I.1999).

**39.** 764 N.E.2d at 843.

assistance, the trooper asked the defendant what he was doing and then requested his license and registration. The court held the request for the license and registration was not an unreasonable seizure.[40] Specifically, the court held that the officer's actions fell "squarely under the trooper's community caretaking function" and the officer was justified in requesting the license because: (1) officers are often required to make a written report of all encounters with citizens; (2) an officer must know who he has assisted in case a citizen files a legal claim against the officer; and (3) innocent activity can turn out later to be criminal activity.[41]

Similarly, in *State v. Brunelle,*[42] in evaluating the extent of the community caretaking exception, the Supreme Court of New Hampshire held that a peace officer's "limited request for information [license and registration], which would enable her to maintain a record of her contact with the vehicle's owner in the event that any questions about the vehicle or her contact with the owner subsequently arose was a reasonable exercise of her community caretaking duties." [43]

■ We agree with the Supreme Courts of Massachusetts and New Hampshire that a police officer's limited request for information is reasonable because it enables him to maintain a record of his contact with the individual encountered. Officers are often required to make written reports of all encounters; an officer

must also know who he has assisted in case someone files a legal claim against him; and innocent activity can turn out later to be criminal activity.

Here, Officer Brittingham's entire initial encounter with Williams was reasonable under the community caretaking doctrine. The weather conditions and early morning hour are objective, specific and articulable facts from which an experienced officer would suspect that Williams was in apparent peril, distress or need of assistance. Thus, it was proper for Officer Brittingham to stop and investigate for the purpose of assisting Williams.[44]

Since it appeared Williams was in need of aid, the officer could take appropriate action to render assistance or mitigate the peril. We agree with the Superior Court that Officer Brittingham's actions were an appropriate effort to render assistance. He stopped his car ten feet behind Williams, approached with his flashlight, and asked Williams if he needed assistance. A two to three minute exchange followed in which Williams declined a ride and explained that his car had broken down and he was walking to meet his mother at a nearby gas station. The community caretaking function did not cease at this point. As part of it, the officer could make an administrative record of the encounter. As Officer Brittingham testified, he asked for Williams's name and date of birth so that he could create a record of the encounter and have a contact in case someone reported him missing or if

---

40. *Id.* at 846.

41. *Id.* at 844, 846.

42. 766 A.2d at 272.

43. *Id.* at 274. *But see State v. Gonzales,* 36 Kan.App.2d 446, 141 P.3d 501, 509 (2006) (finding that because the officer stopped vehicle due to a concern for a bouncing tire, the officer's actions went beyond those justified

by a public safety stop when he demanded and retained defendants' driver's licenses).

44. In addition, Officer Brittingham testified that inmates were sometimes released from a local prison during the overnight shift, and that he often offered rides to those individuals to their intended destination, if it was within town limits, or else to a nearby twenty-four hour business.

a crime was reported in the area. The Officer also told Williams that he could contact him for further assistance.

 Once the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, the caretaking function is over and any further detention constitutes an unreasonable seizure unless the officer has a warrant, or some exception to the warrant requirement applies, such as a reasonable, articulable suspicion of criminal activity. Here, Officer Brittingham terminated the initial encounter once he was assured Williams was not in need of assistance and his caretaking function was at an end. His subsequent seizure of Williams was based upon the outstanding warrants for Williams's arrest, which the officer discovered after the initial encounter. Williams's arrest was authorized by these warrants and, once the arrest had occurred, Officer Brittingham could lawfully search Williams incident to that arrest.[45] The Superior Court did not err in denying Williams's motion to suppress.

### III.

The judgment of the Superior Court is **AFFIRMED.**

---

45. *Harris v. State*, 880 A.2d 1047, 2005 WL 2219212, at *2 (Del. Aug. 15, 2005) (citing *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)); *see also State*

*v. Severin*, 1982 WL 593131 (Del.Super.Ct. March 23, 1982) (citing *Wong Sun v. U.S.*, 371 U.S. 471, 478, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).