Terry L. MOORE, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 97, 2009.

Supreme Court of Delaware.

Submitted: April 28, 2010.
Decided: June 8, 2010.
Reargument En Banc Denied
July 6, 2010.

Bradley V. Manning, Esquire (argued), and Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

Gregory E. Smith, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

On June 18, 2008, New Castle County Police arrested the defendant-appellant, Terry L. Moore ("Moore"), as he was walking with a companion at a distance of approximately 1000 yards from a location where radio broadcast reports indicated a possible stabbing and the sound of gunshots. A grand jury indicted Moore on charges of Possession of a Deadly Weapon by a Person Prohibited ("PDWPP") and Carrying a Concealed Deadly Weapon ("CCDW"). Moore filed a motion to suppress the evidence obtained at the time of his arrest. The Superior Court denied that motion after an evidentiary hearing.

The Superior Court held a three-day bench trial and found Moore guilty of both charges. Moore was sentenced on the PDWPP charge to one year at Level V, suspended for one year at Level II, and on the CCDW charge to one year at Level V, suspended for one year at Level II.

In this direct appeal, Moore argues that when the arresting officer, Sergeant Claudia Malone ("Sgt. Malone"), stopped Moore and his companion, she lacked facts that would support a reasonable, articulable suspicion that Moore may have been involved in criminal activity. Accordingly, Moore argues, the evidence obtained as a result of the illegal stop should have been suppressed. We have concluded that Moore's argument is without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

At approximately 11:15 p.m. on June 18, 2008, the New Castle County Police began receiving reports about a large group of

disorderly black males who were yelling and threatening each other in the vicinity of Spencer Park Townhouses, located off Old Forge Road in New Castle, Delaware. At approximately 11:25 p.m., the New Castle County Police Regional Communication Center ("RECOM") reported that one person involved in the dispute may have been stabbed and fled the area. At approximately 11:26 p.m., RECOM received and immediately broadcast reports of gunshots being fired near the intersection of Cathy Court and Old Forge Drive.

In response to this broadcast, Sgt. Malone and other police officers began heading towards that location. Sgt. Malone later testified that Spencer Park Townhouses is a "high call for service area," which she defined as a high crime area in the Old Forge Corridor, with drug and gun violations giving rise to frequent calls for police service. Sgt. Malone was driving a marked police car. Because she did not hear that other officers were heading west of Cathy Court, she drove in that direction. About two minutes after hearing the broadcast, while heading westbound on Old Forge Road away from Cathy Court, Sgt. Malone observed two black males walking westbound on Old Forge Road near its intersection with Hamilton Court. This location is approximately 1000 feet from the intersection of Cathy Court and Old Forge Road.

The two men were walking away from the area where gunshots and a possible stabbing had just been reported when Sgt. Malone first saw them. She did not observe other people in the area at that moment. Sgt. Malone's actions subsequent to this point led to the discovery that one of the two men, Moore, was carrying an ammunition magazine and a concealed handgun. As a result, Moore was charged with and convicted of PDWPP and CCDW.

### Arrest Report

Malone prepared a written report describing the arrest, dated June 20, 2008. This report, however, does not provide the reasons behind Sgt. Malone's actions on the night of the arrest. The police report states, in relevant part:

> I arrived in the area and upon property check of Old Forge Road, I observed 2 B/M's walking on the westbound side of roadway walking away from and just down the street from the area in which the shots were heard. I had the two subjects place their hands on the hood of my fully-marked patrol vehicle while I performed a pat-down search for weapons.

Therefore, Sgt. Malone's testimony at the suppression hearing must be reviewed to ascertain her reasons for the stop and frisk of Moore. The parties have emphasized different pieces of Sgt. Malone's testimony to further their arguments regarding the validity of the stop and frisk. For clarity and accuracy, therefore, the relevant portions of her testimony on both direct and cross examination are restated in full.

### Initial Observations—Stabbing Victim

Prior to trial, Moore filed a motion to suppress the evidence obtained—the gun and ammunition magazine—arguing that at the time of the warrantless stop and seizure, Sgt. Malone did not have a reasonable, articulable suspicion that Moore had committed or was about to commit a crime. At the suppression hearing, Sgt. Malone was questioned on direct examination by the prosecutor, who first asked Sgt. Malone to describe her initial encounter with Moore and his companion:

> Q: Okay. [So you're at] the intersection of Cathy Court and Old Forge?
> A: Yes.
> Q: What did you do?

A: I proceeded past that area, because I did not hear any officers checking areas west of that location so I proceeded that way. As I—as I drove, I was looking for, obviously, any pedestrian traffic that I could find and I came upon two black males walking on the right hand shoulder in a westerly direction. And actually, one of them had their hands in their pockets and the other one had their hands at the waist. And my first instinct was maybe that was my stab wound victim because his hands were there, it looked like he was protecting his abdomen.

. . .

Q: What were they doing when you first saw them, other than simply walking?

A: One of the men had his hands in both pockets.

Q: Both pockets of what?

A: I don't recall whether it was a jacket pocket or pants pocket, but they were concealed in pockets.

Q: Okay.

A: And another one, I could see was, in particular when I had turned around, made the U-turn, was fidgeting at his waistband with both hands.

Q: And is that the one that you thought could have been the stabbing victim, because he was fidgeting? Do I understand that correctly?

A: Yes, he was fidgeting and my initial instinct was that he was being protective of that area of his body.

On cross examination, defense counsel asked Sgt. Malone to further describe the initial encounter:

Q: Okay. So you drove through the area and you went past the scene of where everything was occurring and then you continued around the curve on Old Forge Road and then you saw the two suspects—or the two black males walking away from the scene on the right side of the road and your lights and sirens were not on?

A: Correct, were not.

Q: Okay. When you were driving, did they look over their shoulders to see you?

A: As I approached, I don't recall them looking over their shoulders, although I—you know, like I said, I spun around and then activated my lights and all that.

Q: Before you turned around though, you drove past them, you saw them, they were of interest to you?

A: Yes.

Q: Okay. But you don't recall them looking over their shoulder at you?

A: I don't recall that, no.

Q: And they certainly didn't flee or make any evasive gestures?

A: No, just gestures that were suspicious to me in nature.

Q: But did you see those before you turned around or after?

A: I could tell that one subject from behind was protective of the mid section of his body. And the other one simply had his hands in his pockets. .

Q: Okay. But they didn't turn around and make eye contact with you, that you recall?

A: Not that I recall, no.

. . .

Q: So sitting here today, you don't know if Mr. Moore here had his hands in his pockets or his waistband?

A: Not during my initial observation. I do remember his hands at his

waistband after I had turned around.

Q: Okay.

A: Initially I simply thought he was—whichever gentlemen had their hands at the center of their body, I thought they were a victim.

### Subsequent View of Moore and Companion

At the hearing, Sgt. Malone also testified that after viewing Moore and his companion from behind, as they walked along the right side of the road ahead of her car, she "drove just past them and then made a U-turn and came back on them so that [she] could illuminate them better and conducted a pedestrian stop." The prosecutor asked Sgt. Malone to further describe what happened:

Q: Now, you told the court that you passed by them in your marked patrol car, turned the patrol car around so that you could use your headlights to illuminate them and I think used the phrase, effected a pedestrian stop. What does that mean?

A: That means that these two individuals were out and about of the scene of a stabbing and also a shots fired complaint. I had two suspicions that I had to satisfy, one of which was is one of these gentlemen the stabbing victim; and secondly, is one of these gentlemen a shooting suspect.

Q: I'm sorry, I asked a bad question. How did you go about stopping the men?

A: I—just verbally. They actually voluntarily stopped. I asked them to show me their hands.

Q: Well, how did you indicate to them that you wanted to talk to them?

A: I asked them to come over to me, walk over to me.

Q: Is that the first thing you said?

A: From what I recall, yes.

Q: Okay. So you—you stopped them by turning your car around and then saying, please come over and talk to me or words to that effect?

A: Yes.

Q: And then I interrupted you. You said you said something else to them.

A: The—one of the subjects—well, the one that had the hands in the pocket still had his hands in his pockets and the other one still had his hands fidgeting in his waistband so I asked them both to show me their hands, because I started getting the feeling that perhaps I was going to be in danger.

Q: Did they do so?

A: They did.

Q: At that point where you said come here and let me talk to you or words to that effect and let me see your hands, were there any other officers within your field of view?

A: No.

Q: Was it your belief that you were the only officer in the immediate vicinity at that time?

A: Yes, other than the ones that were tied up at that other dynamic scene.

. . .

Q: All right. When you said let me see your hands, what happened next?

A: I asked them both to come to my patrol vehicle, which they had—they had already started doing. I asked them both to place their hands on the top of my vehicle.

. . .

Q: All right. And what was your purpose in patting down Mr. Moore?

A: For my safety. I knew they were in the very general vicinity of a shots fired complaint. My suspicion was raised because of the concealment of hands and also the fidgeting at the mid section, which I know from training and experience is a common place to conceal a firearm or any other weapon in the waistband. So I began patting down for my safety.

On cross-examination, defense counsel asked Sgt. Malone to describe this interaction in more detail:

Q: Okay. So you turned around and then reversed course. And then did you pull off on the left or right side of the road?

A: I pulled off on the same side as they were on. So since I had turned around, it was now my left.

Q: Against traffic?

A: Correct.

Q: Okay. Did you have your lights or sirens on at this point?

A: Only my lights.

Q: Your red and blue flashing?

A: Correct.

. . .

Q: When you turned around, did you put your lights and sirens on as you turned around or right when you approached them? I'm sorry, just your lights, you didn't put your siren on.

A: It was a very short distance from when I turned around, so if you're asking me if I thought it was evident to them that they were being stopped by a marked police car and by a uniformed officer, my answer to you is yes. Precisely when I turned my lights on, whether it was during the U-turn or after, I don't remember.

Q: I wasn't asking you that but I probably would have, so thank you. So

they were compliant when you turned around. So when you first observed them and you were driving past them, based on your testimony, this was about 11:25 at night; correct?

A: Yes.

Q: Are there any streetlights or anything in that area?

A: Some, but it's fairly dimly lit.

Q: Is it fair to say that the only thing that illuminated them was probably your headlights?

A: For the most part, yes.

Q: And how long do you think you had a chance to observe them as you were driving past them the first time?

A: Probably five seconds.

Q: Five seconds? It was a very brief period of time, is that fair to say then?

A: Yes.

. . .

Q: Now, turning to what caught your attention about these two individuals, you said it was the hands in the pocket of the one and the other one fidgeting with his waistband. Do you have any recollection of which person was doing which?

A: I don't recall that, no.

. . .

Q: So it was—and then once you turned around, I gather before— before you got out of your car, did you observe more fidgeting?

A: Yes. He still had his hands right here in the center of his body. (Indicating.)

Q: And it's—obviously, that drew your attention?

A: Yes.

. . .

Q: ... When you drove past them initially, one of them was fidgeting at their waistband and that caught your attention?

A: Yes.

Q: And when you turned around and could see them head on, that person was still doing something similar?

A: Was still doing—well, I don't know if it was the same person, but later identified as Mr. Moore was—had his hands at his waistband and I could see, obviously, that he wasn't a stabbing victim, at least that I could tell. He wasn't bleeding through or anything. So then I switched over to an officer safety mind thought, I guess at that point.

### Moore's Arrest

Sgt. Malone directed Moore to stand at the front of her patrol car and directed his companion to stand towards the rear of the vehicle, "to separate them because it was two versus one, so for my safety." Sgt. Malone asked the men to place their hands on the car and questioned them as to their names and their business abroad. As Sgt. Malone was questioning Moore, she began patting him down as a safety precaution.

While patting down Moore, she encountered a hard oblong object in his pants pocket. Sgt. Malone asked him what it was, but Moore did not respond. She retrieved the object from his pocket and discovered it was an ammunition magazine to a .380 caliber pistol. At that point, Sgt.

Malone handcuffed Moore and radioed for additional units. She asked Moore to sit on the sloped curve of the roadway just in front of the patrol car, where he was illuminated by the headlights. While he was sitting down, a .380 caliber pistol fell out of Moore's pants. Moore was placed under arrest for CCDW and PDWPP.

### Reasonable Person Detention Standard

An individual's right to be free from unreasonable government searches and seizures is secured by the Fourth Amendment of the United States Constitution. This right applies against the states through the Due Process Clause of the Fourteenth Amendment.[1] The right of Delaware citizens is further secured by Article I, § 6 of the Delaware Constitution. Law enforcement officers may stop or detain an individual for investigatory purposes if the officer has reasonable and articulable suspicion to believe the individual is committing, has committed, or is about to commit a crime.[2]

 Before this Court can decide whether a stop was supported by reasonable articulable suspicion or otherwise justified,[3] we must first make the threshold inquiry of whether a stop actually occurred.[4] A person is stopped or seized "when the officer, by means of physical force or show of authority, has in some way restrained the liberty" of an individual.[5] In accordance with the Delaware Constitution, this Court focuses its inquiry on whether and when a reasonable person

1. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

2. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Jones v. State*, 745 A.2d 856, 861 (Del.1999); Del.Code Ann. tit. 11, § 1902 (2007).

3. *Williams v. State*, 962 A.2d 210, 216–222 (Del.2008) (discussing community caretaker doctrine).

4. *Id.* at 214 (citing *Lopez–Vazquez v. State*, 956 A.2d 1280, 1286 (Del.2008); *Purnell v. State*, 832 A.2d 714, 719 (Del.2003) ("To determine whether the stop was proper this Court must first examine the point at which [the defendant] was stopped.")).

5. *Terry v. Ohio*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868.

would have believed that he or she was not free to ignore a police presence.[6]

### When Stop Occurred

In denying Moore's motion to suppress, the Superior Court held that the stop occurred when Sgt. Malone asked Moore to "place your hands on the car." Nevertheless, the Superior Court held that, even if the stop occurred earlier, when Sgt. Malone had turned her car around and asked Moore and his companion to "show me your hands," its analysis of the stop remained the same. The Superior Court stated "[v]ery little time (apparently seconds) passed between Sgt. Malone's instruction to 'show me your hands' and 'place your hands on the car,'" and "Sgt. Malone's reasonable and articulable suspicion had crystallized prior to her request that [Moore] show her his hands."

In *Flonnory v. State*,[7] this Court held that a seizure occurred when two passengers in a car were flanked on three sides of the car by police officers. We reasoned, "[a] reasonable person in Flonnory and Barbour's situation could have only believed that the conduct of the officers communicated to them that they were not at liberty to go about their business."[8] Similarly, in *Quarles v. State*,[9] we held that a stop occurred where two officers were following a defendant down the sidewalk on foot, and a third "drove his marked police car east on Second Street, against the flow of traffic, pulled his vehicle halfway up on to the sidewalk, and stopped just west of where Quarles was standing."[10] Because Quarles stopped "[w]hen approached by the three officers under these conditions," he demonstrated "an act of submission to a show of authority by the police."[11]

The record reflects that a reasonable person in Moore's position would not have felt free to ignore the police presence.[12] As in *Quarles* (where the police officer drove toward the defendant against the flow of traffic and stopped in close proximity to where the defendant was standing), Sgt. Malone's actions indicated to Moore that he was not free to leave. We hold that the initial stop occurred when Sgt. Malone turned around in the middle of the street with lights flashing and pulled up in front of Moore and his companion, driving against the flow of traffic, and asked the two men to show her their hands.

### Community Caretaker Doctrine

In *Williams v. State*,[13] this Court adopted the community caretaker doctrine, as promulgated by the Montana Supreme Court in *State v. Lovegren*,[14] "to ensure that investigations conducted in Delaware under the community caretaker doctrine are reasonable."[15] The doctrine originates from a recognition that "[l]ocal police have multiple responsibilities, only one of which is the enforcement of criminal law. . . ."[16] As we stated in *Williams*:

6. *Purnell v. State*, 832 A.2d at 719; *Flonnory v. State*, 805 A.2d 854, 857 (Del.2001); *Jones v. State*, 745 A.2d at 862.

7. *Flonnory v. State*, 805 A.2d 854 (Del.2001).

8. *Id.* at 858 (citing *Quarles v. State*, 696 A.2d 1334, 1337 (Del.1997)).

9. *Quarles v. State*, 696 A.2d 1334 (Del.1997).

10. *Id.* at 1337.

11. *Id.*

12. *See Jones v. State*, 745 A.2d 856, 862 (Del. 1999).

13. *Williams v. State*, 962 A.2d 210 (Del.2008).

14. *State v. Lovegren*, 310 Mont. 358, 51 P.3d 471 (2002).

15. *Williams v. State*, 962 A.2d at 219.

16. *State v. Acrey*, 148 Wash.2d 738, 64 P.3d 594, 599 (2003) (quoting Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. Chi. Legal F. 261, 261 (1998)).

The modern police officer is a "jack-of-all-emergencies," with " 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' " To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.[17]

The community caretaker doctrine has three elements.

First, if there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in apparent peril, distress or need of assistance, *the police officer may stop and investigate* for the purpose of assisting the person. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, the caretaking function is over and any *further detention constitutes an unreasonable seizure unless the officer has a warrant, or some exception to the warrant requirement applies, such as a reasonable, articulable suspicion of criminal activity.*[18]

Sgt. Malone's initial stop of Moore and his companion was reasonable under the community caretaker doctrine. Moore and his companion were walking away from the area where gunshots and a possible stabbing had just been reported. As Sgt. Malone drove in the same direction that the men were walking, she could tell from behind that "one of them had their hands in their pockets and the other one had their hands at the waist." As Sgt. Malone testified, based on this hand placement, "my first instinct was maybe that was my stab wound victim because his hands were there, it looked like he was protecting his abdomen."

On cross examination, again Sgt. Malone explained, "[i]nitially I simply thought he was—whichever gentleman had their hands at the center of their body, I thought they were a victim." This explanation is a proper articulation of objective and specific facts which led Sgt. Malone, an officer with sixteen years of experience, to believe that Moore was in apparent peril, distress or need of assistance. Accordingly, Sgt. Malone properly stopped Moore and his companion to render assistance pursuant to the community caretaker doctrine.[19] That initial stop did *not* require a reasonable articulable suspicion of criminal activity.[20]

As we stated in *Williams*, however, the caretaking function is over when "the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated . . . ."[21] Here, Sgt. Malone testified that once she had turned around her vehicle and illuminated Moore and his companion with the

17. *Williams v. State,* 962 A.2d at 216–17 (citing 3 Wayne R. Lefave, *Search and Seizure* § 5.4(c) (4th ed. 2004)).

18. *Williams v. State,* 962 A.2d at 219 (emphasis added).

19. *See Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1390 (Del.1995) ("We recognize that this Court may affirm on the basis of a different rationale than that which was articulated by the trial court.").

20. *Williams v. State,* 962 A.2d at 219.

21. *Id.*

car's headlights, she saw that Moore still "had his hands at his waistband and I could see, obviously, that he wasn't a stabbing victim, at least that I could tell. He wasn't bleeding through or anything." Accordingly, the caretaker function concluded at the moment Sgt. Malone realized that neither of the men was a stabbing victim.

### Terry *Stop and Frisk*

 Sgt. Malone's initial stop was justified pursuant to the community caretaker doctrine. As we stated in *Williams*, "[t]o require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public."[22] However, in *Williams*, we also held that once "the caretaking function is over ... any further detention constitutes an unreasonable seizure unless the officer has a warrant, or some exception to the warrant requirement applies, such as a reasonable, articulable suspicion of criminal activity."[23]

In this case, the continued stop of Moore required "a reasonable, articulable suspicion of criminal activity."[24] Sgt. Malone's testimony at the suppression hearing provided the factual basis for such a finding. She testified that immediately after she realized that neither of the men was the stabbing victim, she "switched over to an officer safety mind thought, I guess at that point," because "the one that had the hands in the pocket still had his hands in his pockets and the other one still had his

hands fidgeting in his waistband." Sgt. Malone testified: "My suspicion was raised because of the concealment of hands and also the fidgeting at the mid section, which I know from training and experience is a common place to conceal a firearm or any other weapon in the waistband."

 If while acting as a community caretaker or during a voluntary encounter a police officer "observes unusual conduct which leads him [or her] reasonably to conclude in light of his [or her] experience that criminal activity may be afoot," the officer may temporarily stop and detain the person.[25] In connection with such a detention, if the officer is presented with circumstances which also create a reasonable belief that the person may be armed with a weapon, the officer may conduct a protective frisk for his or her own safety.[26] But, in *Terry*, the concurring opinion by Justice Harlan noted:

> [P]olicemen have no more right to "pat down" the outer clothing of passers-by, or of persons to whom they address casual questions, than does any other citizen.... [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop.... [T]he person addressed ... certainly need not submit to a frisk for the questioner's protection.[27]

 Accordingly, under *Terry*, an officer may not conduct a protective search

**22.** *Williams v. State*, 962 A.2d 210, 217 (Del. 2008).

**23.** *Id.* at 219.

**24.** *Id.*

**25.** *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**26.** *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also*

*United States v. Mayo*, 361 F.3d 802, 806–07 (4th Cir.2004).

**27.** *Terry v. Ohio*, 392 U.S. at 32–33, 88 S.Ct. 1868 (1968) (Harlan, J., concurring). *See also Adams v. Williams*, 407 U.S. at 146, 92 S.Ct. 1921 ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.").

for weapons without first having a reasonable articulable suspicion of criminal activity that supports an investigatory stop.[28] In analyzing whether a *Terry* stop is supported by reasonable suspicion, a court must determine whether the "totality of the circumstances" presented the detaining officer with a "particularized and objective basis" to conclude that a crime may have been committed or was being committed.[29] In this case, the Superior Court found that Sgt. Malone was presented with the following circumstances, before she effectuated a continued stop of Moore under *Terry*:

Sgt. Malone, a 16–year veteran of the New Castle County Police Department, was aware of at least the following facts at the time she told [Moore] and his companion to "show me your hands."

(1) she was in a high crime area that was the source of numerous complaints involving guns and drugs;

(2) she was responding to citizen complaints about a large group of disorderly men;

(3) within a few minutes of her first contact with [Moore] a person was allegedly stabbed and fled the scene;

(4) within a few minutes of her first contact with [Moore] another police officer reported hearing multiple gun shots;

(5) [Moore] and his companion were the first pedestrians she observed near the scene of the reported gunfire;

(6) she observed [Moore] and his companion approximately 1000 feet away from Cathy Court only a few minutes after the report of shots fired;

(7) she saw that one of the men had his hands in his pockets and the other [Moore] was fidgeting with something in his waistband; and

(8) her training and experience alerted her that the waistband area is a common place to conceal weapons.

■ The totality of these circumstances demonstrated that Sgt. Malone had a reasonable articulable suspicion that Moore was carrying a concealed weapon (a crime) and may have used that weapon to participate in the criminal activity that had been reported nearby and shortly before.[30] Therefore, Sgt. Malone was justified in conducting a *Terry* stop. Since the reasonably suspected criminal activity involved a weapon, *Terry* also permitted Sgt. Malone to frisk Moore for her safety. Moore argues that there could be other explanations for his presence in the area and the actions that Sgt. Malone observed. That may be, but as the United States Supreme Court has stated, however, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[31]

Having evaluated the circumstances of Moore's case under the principles of *Terry*, we conclude that Sgt. Malone had a reasonable articulable suspicion to stop and frisk Moore. Sgt. Malone had a reasonable articulable suspicion that Moore was engaged in criminal activity by concealing a weapon. Although her role as a commu-

---

**28.** *United States v. Mayo*, 361 F.3d at 806.

**29.** *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

**30.** *See Woody v. State*, 765 A.2d 1257, 1262 (Del.2001) ("In determining whether there was reasonable suspicion to justify a detention, the Court defers to the experience and training of law enforcement officers.") (citing *Jones v. State*, 745 A.2d 856, 861 (Del.1999); *United States v. Cortez*, 449 U.S. at 418, 101 S.Ct. 690; *United States v. Carter*, 1999 WL 1007044, at *4 (D.Del. Oct. 22, 1999)).

**31.** *United States v. Arvizu*, 534 U.S. at 277, 122 S.Ct. 744 (citing *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

nity caretaker had ceased, those suspicions entitled Sgt. Malone, under the Supreme Court's holding in *Terry,* to continue the detention of Moore and to frisk him for her safety.[32] Accordingly, the ammunition magazine that she recovered when Sgt. Malone frisked Moore was properly admitted into evidence.

### Gun Found in Plain View

After Sgt. Malone discovered the ammunition magazine and handcuffed Moore, she asked Moore to sit on the sloped curve of the roadway just in front of the patrol car, where he was illuminated by the headlights of her car. While Moore was sitting down, a .380 caliber pistol fell out of his pants. "Police officers may seize evidence that is in plain view without a warrant," provided that first, the police did not "violate the Fourth Amendment in arriving at the [place] from which the evidence could be plainly viewed," and second, "the incriminating character of the evidence seized must be immediately apparent."[33] We have concluded that the chain of events that led to Sgt. Malone's initial stop of Moore under the community caretaker doctrine, and her continued detention of Moore under *Terry,* did not violate the Fourth Amendment. Therefore, since Moore was properly detained, Sgt. Malone was entitled to seize the gun that fell from Moore's waistband onto the ground within her plain view.

### Conclusion

The judgments of the Superior Court are affirmed.

---

32. *See Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. 1921; *see also United States v. Black,* 525 F.3d 359, 364 (4th Cir.2008); *United States v. Mayo,* 361 F.3d at 806–07.

33. *Cooke v. State,* 977 A.2d 803, 854–55 (Del. 2009) (internal citations omitted).