IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,

v.

CORTEZ A. HAMILTON, SR.,

Defendant.

I.D. No. 1501012432 WLW

Submitted: September 15, 2017
Decided: October 12, 2017

**OPINION**

Upon Defendant's Motions to Suppress.
*Denied in Part; Granted in Part.*

Stephen R. Welch, Esquire and Lindsay A. Taylor, Esquire of the Department of Justice, Dover, Delaware; attorneys for the State of Delaware.

John R. Garey, Esquire, Dover, Delaware; attorney for the Defendant.

WITHAM, R.J.

This case presents the Court with several issues triggered by a number of search warrants issued in a murder investigation. The Court must decide whether to grant the Defendant's various Motions to Suppress. For the reasons set forth below, Defendant's motions are **DENIED** in part and **GRANTED** in part.

## FACTS[1]

On January 10, 2015, Keisha Hamilton was reported missing by her sister, Janell Foster. Ms. Foster was concerned because she was unable to contact Keisha, or her husband, Cortez Hamilton ("Defendant"), after receiving "alarming messages" from Keisha the night before. Ms. Foster informed police that, according to Keisha, the Defendant was acting strangely. Keisha reportedly feared for her safety and requested that her sister contact police if anything happened to her. Ms. Foster was also concerned because Keisha failed to appear for her shift at work.

Delaware State Police ("DSP"), pursuant to Ms. Foster's report, responded to the residence shared by Keisha and the Defendant (hereinafter, referred to as, the "Residence") because Keisha was reportedly last seen at the Residence the night before. DSP were accompanied by Ms. Foster and Keisha's son, Alvin West.[2] DSP knocked on the door and rang the doorbell multiple times, but no one responded. DSP also did not observe any cars at the Residence. Thereafter, Mr. West provided

---

[1] The facts are gleaned from the pleadings and a hearing on this matter held on September 14, 2017, and September 15, 2017.

[2] Mr. West, at the request of Keisha, had purportedly been staying with Ms. Foster for a short period of time before his mother's disappearance. He testified at the hearing on this matter that he still had a room at the Residence and a key. He also stated that he was free to come and go from the Residence as he pleased.

his house-key to DSP in order for police to search the Residence for Keisha. DSP were unable to locate Keisha. However, as DSP were searching for Keisha, police discovered large pools of blood, blood stains, blood spatter, and a large knife. DSP determined the blood was human through the use of a Blood Kit, but were unable to determine from whom the blood came.

In addition to searching the Residence, DSP searched numerous surrounding shopping centers for any signs of Keisha. As a result, at approximately 4:35 P.M. on January 10, 2015, DSP discovered Keisha's Toyota Matrix parked behind a local business. According to DSP, the vehicle appeared to have been abandoned. DSP also observed a purse located on the floor of the front passenger compartment. DSP subsequently prepared a warrant in order to search the vehicle.

At approximately 5:30 P.M. on January 10, 2015, DSP executed the first warrant to conduct a more thorough search of the Residence (hereinafter, referred to as, the "January 10, 2015 Residence Warrant").[3] The January 10, 2015 Residence Warrant was issued pursuant to the information provided by Ms. Foster, the blood evidence already discovered at the Residence, and information that Keisha had obtained Protection From Abuse Orders ("PFAs") against the Defendant in the past. DSP seized a clothing zipper, a black handle butcher knife, an empty plastic bottle, a white blanket, two bathroom containers, swabs containing suspected blood, five

---

[3] The search of the Residence constituted DSP's second search of the house.

towels, an HP laptop, and two carpet samples.[4]

Also, as DSP were unable to identify from whom the blood discovered at the Residence belonged to, police were concerned that Keisha's children may be in danger. In order to locate the children, DSP issued what is known as, an "AMBER Alert." DSP issued the alert, not only in Delaware, but in surrounding states as well. Indiana State Police ("ISP"), responding to the alert, discovered the children traveling with the Defendant in Indiana at approximately 6:38 P.M. on January 10, 2015. The Defendant was driving a red 2005 Chevrolet Suburban (the "Suburban"). Although the Defendant was stopped pursuant to the AMBER alert, the Defendant was held by ISP as a result of DSP's continued investigation.

On January 11, 2015, at approximately 2:45 A.M., ISP executed a warrant to search the Suburban seized from the Defendant. The warrant was based on information provided by Ms. Foster to DSP, the blood evidence discovered by DSP at the Residence, and the fact that Keisha's vehicle was found purportedly abandoned in a parking lot. ISP seized a bloody hammer, bloody clothing belonging to Keisha,

---

[4] The January 10, 2015 Residence Warrant permitted DSP to search and seize the following from the Residence: (1) any and all trace evidence, blood DNA, and/or hair samples; (2) any and all bloody clothing or clothing associated with an assault; (3) any weapons including, but not limited to, firearms, cutting instruments, blunt objects, and/or any other weapon that could be utilized in an assault; (4) any cellular telephones, electronic communication devices, and/or other communication devices belonging to Keisha Hamilton and/or Cortez Hamilton; (5) any paperwork indicating travel documents by Keisha Hamilton and/or Cortez Hamilton; and (6) video and photographs of the residence, property, and crime scene.

In addition the warrant stipulated that the items seized must have been "used or intended to be used for: an assault on a human being where a large amount of blood was lost from the victim."

clothing and shoes belonging to the Defendant – which were partially covered with mud and stained blood – and various personal items belonging to Keisha, including her wedding ring, a lock of her hair, her purse, and a cell phone.[5]

On January 11, 2015, at approximately 12:00 P.M., DSP executed a warrant to search Keisha's Toyota Matrix. The warrant was based on the information provided by Ms. Foster, the blood evidence already discovered at the Residence, and information that Keisha had obtained PFAs against the Defendant in the past. DSP seized soil samples, DNA swabs, two rolls of duct tape, a Coach bag containing miscellaneous ID, and a gear shift knob.[6]

On January 15, 2015, at approximately 3:00 P.M., DSP executed the second warrant to search the Residence (hereinafter, referred to as, the "January 15, 2015 Residence Warrant").[7] According to the affidavit of probable cause, the evidence

---

[5] The warrant permitted ISP to search and seize the following from the Suburban: "clothing, blood, bodily fluids and/or human remains, cell phones, and GPS devises [sic], that are believed to be in the vehicle."

[6] The warrant permitted DSP to search and seize the following from the Toyota Matrix: (1) any and all trace evidence, blood, DNA, and/or hair samples; (2) any and all bloody clothing or clothing associated with an assault; (3) any weapons including, but not limited to, firearms, cutting instruments, blunt objects, and/or any other weapon that could be utilized in an assault; (4) any cellular telephones, electronic communication devices, and/or other communication devices belonging to Keisha Hamilton and/or Cortez Hamilton; (5) any paperwork indicating travel documents by Keisha Hamilton and/or Cortez Hamilton; and (6) video and photographs of the vehicle, proper, and crime scene.

In addition the warrant stipulated that the items seized must have been "used or intended to be used for: an assault on a human being where a large amount of blood was lost from the victim."

[7] The January 15, 2015 Residence Warrant constituted DSP's third search of the Residence.

discovered by ISP during their search of the Suburban indicated that Keisha may have been murdered. The evidence also indicated how Keisha's body may have been disposed of. Thus, DSP requested another opportunity to search the Residence. DSP seized molding from a hallway bathroom door, swabbing from a bathroom door, a fitted sheet from the master bedroom, lower trim of a dresser, drywall in the hallway, the fronts of three dresser drawers, and a box containing trash bags.[8] At the hearing on this matter, DSP testified that all of the items, except the trash bags, were seized because they appeared to have blood on them. The trash bags were seized, according to DSP, because trash bags are often used to dispose of a body.

On February 13, 2015, at approximately1:30 P.M., DSP executed a third warrant to search the Residence (hereinafter, referred to as, the "February 13, 2015 Warrant").[9] The February 13, 2015 Warrant also permitted DSP to search the Suburban, as it had been transported from Indiana. DSP were particularly interested in searching any GPS device located within the Suburban in order to determine where the vehicle had traveled prior to the Defendant's arrest. As Keisha had not been

---

[8] The January 15, 2015 Residence Warrant permitted DSP to search and seize the following from the Residence: (1) any and all trace evidence to include but not limited to blood, hair, fibers, fluids and fingerprints; (2) any and all blood stained clothing, articles or objects; (3) photographs and video of the Residence; (4) any and all electronic devices capable of storing electronic information to include but not limited to cellular telephones, video cameras, and computers and the contents thereof; (5) any and all paperwork or articles that would provide insight into the motive for or the circumstances surrounding the disappearance of Keisha Hamilton; (6) any and all dangerous weapons or instruments that may have been used in the disappearance of Keisha Hamilton; (7) any item that may have been used to dispose of a body; and (8) any type of soil sample located in the residence.

[9] The February 13, 2015 Warrant constituted DSP's fourth search of the Residence.

located, DSP thought the GPS might lead to discovery of Keisha's body. DSP seized a stereo system from the Suburban. DSP also removed additional carpet samples, carpet padding, and subflooring from the Residence in order to conduct a "blood volume examination."[10]

## THE PARTIES CONTENTIONS[11]

First, the Defendant contests the initial warrantless search conducted by DSP, pursuant to Ms. Foster's missing person's report. The Defendant contends that it was unlawful for DSP to enter the Residence without a warrant. If the warrantless search was permissible, the Defendant alleges that the scope of the search by DSP was

---

[10] The February 13, 2015 Warrant permitted DSP to search and seize the following from the Residence and the Suburban: (1) a carpet sample similar to the carpet sample removed from the previous search warrant; (2) carpet padding containing a suspected blood; (3) carpet padding not containing any suspected blood; (4) any subfloor containing any suspected blood; (5) a section of subfloor not containing suspected blood; (6) photographs and video of the carpet, padding, and flooring removed from the residence; (7) any and all electronic devices located inside the Suburban capable of storing electronic information, to include, but not limited to, GPS devices, factory installed equipment, to include, but not limited to, the Airbag Control Module, cellular telephones, video cameras, still cameras, and computers and the contents thereof; (8) any suspected blood or trace evidence located within and/or on the Suburban; and (9) photographs and video of the interior and exterior of the Suburban.

[11] The Defendant filed three separate motions to suppress in this matter. For the purposes of this decision, the Defendant's arguments are consolidated. The Defendant challenges the following: (1) DSP's warrantless search of the Residence on January 10, 2015; (2) the January 10, 2015 Residence Warrant executed by DSP; (3) DSP's issuance of the AMBER Alert; (4) ISP's reliance on the AMBER Alert to seize the Defendant in Indiana; (5) ISP's subsequent warranted search of the Suburban on January 11, 2015; (6) DSP's warranted search of the Toyota Matrix on January 11, 2015; (7) the January 15, 2015 Residence Warrant; and (8) the February 13, 2015 Warrant. Detective David Weaver, of the DSP, testified at the hearing on this matter that DSP executed an additional seven warrants to search the Residence. However, as the Defendant has not challenged the additional warrants, it is unnecessary for the Court to address them.

unnecessary to determine whether or not there were occupants in the Residence. The Defendant also contends that the warrantless testing of the blood discovered was improper. As the evidence discovered during the warrantless search of the Residence was relied upon to obtain subsequently executed warrants, the Defendant contends that evidence obtained based on the information must be suppressed as "poisonous fruit."

The State contends that the warrantless search of the Residence was permissible pursuant to either: (1) Alvin West's consent; (2) the "community caretaker doctrine;" or (3) the "emergency doctrine." If any of the doctrines apply, the State contends that any evidence discovered in the Residence is admissible pursuant to the "plain view" doctrine. Thus, the subsequent warrants would be proper as well.

Second, the Defendant contends that the January 10, 2015 Residence Warrant, executed by DSP, required DSP to submit a written inventory within ten days of the execution of the warrant. The written inventory was not submitted until March 19, 2015, well in excess of sixty days from the date of the warrant application. Thus, the Defendant seeks to suppress any and all evidence seized as a result of the search.

The State contends that untimely "warrant returns" are immaterial to the validity of any search warrant. Furthermore, the Defendant has not alleged any prejudice as a result. Therefore, according to the State, the Defendant's arguments are without merit.

Third, the Defendant contests the stop of the Suburban and the subsequent warrant executed by ISP. According to the Defendant, the "AMBER Alert" was not

8

issued properly because there was no indication that Keisha's children had been abducted or were in any danger. The Defendant, therefore, argues that ISP did not have a basis to stop his vehicle. The Defendant also contends that the subsequent warrant to search the Suburban was unsupported by probable cause. In addition, the Defendant claims that the search of the Suburban exceeded the scope of the warrant. Thus, the Defendant seeks to suppress any and all evidence seized from the Suburban.

The State contends that the "AMBER alert" was properly issued. Therefore, according to the State, ISP had a basis to stop the Defendant. The State also contends that the subsequent warrant to search the Suburban was supported by probable cause. Finally, the State alleges that the warrant was properly executed. Therefore, according to the State, the Defendant's arguments are without merit.

Fourth, the Defendant contests the search of Keisha's Toyota Matrix. According to the Defendant, the warrant to search the vehicle was unsupported by probable cause. The Defendant does not believe the warrant demonstrates how the vehicle contained evidence of a crime. Furthermore, the Defendant alleges that DSP exceeded the scope of the authorized search. Thus, the Defendant seeks to suppress any and all evidence seized from the Toyota Matrix.

The State contends that the Defendant lacks standing to challenge the search of the Toyota Matrix because the vehicle was "abandoned." If the merits of the Defendant's arguments are considered, the State alleges that the search warrant was adequately supported by probable cause. Furthermore, the State argues that the search of the vehicle did not exceed the scope of the warrant. The seizure of evidence by police was either explicitly permissible pursuant to the search warrant or the "plain

view" doctrine. Therefore, according to the State, the Defendant's arguments are without merit.

Fifth, the Defendant contests the January 15, 2015 Residence Warrant. The Defendant alleges that items requested in the January 15, 2015 Residence Warrant could have been readily ascertained and requested in the January 10, 2015 Residence Warrant. Furthermore, the Defendant contends that items seized pursuant to the January 15, 2015 Residence Warrant exceeded the scope of the permissible search. Finally, the Defendant asserts that the warrant returns were submitted late. Thus, the Defendant seeks to suppress any and all evidence discovered during the execution of the January 15, 2015 Residence Warrant.

The State, in response, contends that a late warrant return does not invalidate a valid search warrant. And, the Defendant has not alleged any prejudice as a result of the late return. Furthermore, the State contends that the Defendant has failed to indicate which items were taken in violation of the January 15, 2015 Residence Warrant. Therefore, according to the State, the Defendant's arguments are without merit.

Sixth, the Defendant contests the February 13, 2015 Warrant. According to the Defendant, the warrant returns were submitted late. Thus, the Defendant seeks to suppress evidence obtained as a result of the search.

The State, again, contends that a late warrant return does not invalidate a valid search warrant. And, the Defendant has not alleged any prejudice as a result of the late return. Therefore, according to the State, the Defendant's arguments are without merit.

10

## STANDARD OF REVIEW

When evidence is collected according to a search warrant, the defendant bears the burden of proving by a preponderance of the evidence that the search or seizure violated his rights under the United States or Delaware Constitutions or Delaware statutory law.[12]

If, on the other hand, a defendant moves to suppress evidence collected in a warrantless search, the State bears the burden of proving by a preponderance of the evidence "that the challenged police conduct comported with the rights guaranteed [to the defendant] by the United States Constitution, the Delaware Constitution and Delaware statutory law."[13]

## DISCUSSION

The Defendant, seeking to suppress evidence seized by Indiana and Delaware police, filed three motions to suppress in this matter. Although the Court determined that all three motions were untimely, the Court granted the Defendant's Motions to File Out of Time because the State agreed that it was necessary to hear the motions on their merits.

The Court's decision to accept the Defendant's Motions to Suppress, however, does not relieve the Defendant of complying with the Court's rules of procedure. Of particular importance to this matter is Superior Court Criminal Rule 41(f). The Court

---

[12] *State v. Palmer*, 2016 WL 2604692, at *3 (Del. Super. May 3, 2016).

[13] *State v. Kang*, 2001 WL 1729126, at *3 (Del. Super. Nov. 30, 2001).

11

previously addressed the application of Rule 41(f) in *State v. Dunson.*[14]

*Dunson* provides in part:

A movant seeking suppression of evidence has an obligation to present both a specific statement of facts and a statement of legal authority so as to persuade the Court to grant its motion.[15] Neglect of this obligation will lead the Court to determine that a hearing or further consideration of the motion is unnecessary.[16] The Court invites practitioners to consider motions to suppress as analogous to a pleading or an oral objection to the admissibility of evidence made during the course of trial – i.e., requiring a high degree of specificity.[17] "General and conclusory allegations are not sufficient to trigger a hearing."[18] Motions that lack sufficient factual allegations and statement of law force the Court into the role of counsel, making the parties' best arguments for them, and raising issues they themselves did not raise. This is inappropriate in our

---

[14] *State v. Dunson*, No. 1612008614, at *2-3 (Del. Super. July 7, 2017).

[15] Del. Super. Ct. Crim. R. 41(f) ("the motion shall . . . state the grounds upon which it is made with sufficient specificity to give the state reasonable notice of the issues and enable the court to determine what proceedings are appropriate to address them."); *State v. Wilson*, 2008 WL 2192815, at *1 (Del. Super. May 23, 2008) (denying a motion to suppress without a hearing when the motion was "completely devoid of legal authorities and facts relied on."); *State v. Manley*, 706 A.2d 535, 540 (Del. Super. Sep. 17, 1996) (holding that motions lacking sufficient factual allegations may be summarily dismissed).

[16] *State v. Small*, 2010 WL 2162898, at *1 (Del. Super. May 27, 2010). *See* 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 675 (3d ed. 2004) (An evidentiary hearing need not be set as a matter of course, but only if the motion [to suppress] alleges facts that, if proved, would require the grant of relief. Factual allegations that are general and conclusory or based upon suspicion and conjecture will not suffice.").

[17] *See* Wayne R. LaFave, et. al., Search and Seizure § 11.2(a), at 38 (4th ed. 2004) (citing *State v. Johnson*, 16 Or. App. 560, 567 (1974)).

[18] *Wilson*, 2008 WL 2192815 at *1.

12

adversarial system.[19]

*Dunson,* is also instructive as to Rule 41(f)'s requirement to sufficiently allege standing in a motion to suppress evidence. *Dunson* held:

> To gain access to the law's exclusionary remedy for illegal searches or seizures, a defendant must have standing, which will be found if a defendant "has a legitimate expectation of privacy in the invaded place."[20] A defendant carries the burden of demonstrating standing to challenge the search and seizure.[21] Superior Court Criminal Rule 41(f) requires that a motion to suppress "set forth the standing of the movement."

With *Dunson* and Rule 41(f) in mind, the Court will address the challenged searches and seizures in the order that they arose during the course of the police investigation.

## I. The Warrantless Search of the Residence

### a. Does the Defendant have Standing to challenge the search?

The Defendant has sufficiently alleged standing to contest the search of the Residence. Although the Defendant failed to cite any legal precedent to support his allegations of standing, the Defendant provided a sufficient factual basis to convince the Court that standing exists. The Defendant states that "he had a reasonable

---

[19] *Gonzalez v. Caraballo,* 2008 WL 4902686, at *3 (Del. Super. Nov. 12, 2008) ("Courts throughout the country hold that they are not obligated to do 'counsel's work for him or her.'").

[20] *Rakas v. Illinois,* 439 U.S. 128, 143 (1978); *Thomas v. State,* 467 A.2d 954, 958 (Del. 1983).

[21] *Righter v. State,* 704 A.2d 262, 265 (Del. 1997); *see United States v. Salvucci,* 448 U.S. 83, 90-91 (1980).

expectation of privacy in *his* residence located at 113 East Cayhill Lane, Smyrna, DE 19977."[22] In *Thomas v. State*, the Delaware Supreme Court held that:

> a proponent of a motion to suppress has standing to contest the legality of a search and seizure only if he can assert either a property or a possessory interest in the areas searched on the property seized and if he can show a legitimate expectation of privacy in the areas searched.[23]

As it is axiomatic that a person has a possessory interest in one's own home, and since the State does not contest the Defendant's expectation of privacy in the Residence, the Defendant has satisfied his burden to demonstrate standing to contest the search of the Residence.

### b. Does an exception to the warrant requirement apply?

It is uncontested that Delaware State Police entered the Residence without a warrant on January 10, 2015. Generally, all warrantless entries into a private residence are invalid, save a few narrowly-defined exceptions.[24] These exceptions are to be narrowly construed.[25] The State, in its' response and at a hearing on this matter, contends that three exceptions are relevant in this instance: (1) the "consent doctrine;" (2) the "community caretaker doctrine;" and (3) the "emergency doctrine." The Court will address all three in order.

---

[22] (emphasis added).

[23] *Thomas,* 467 A.2d at 958.

[24] *See, e.g., Hanna v. State,* 591 A.2d 158, 162 (Del. Super. 1991).

[25] *State v. Hedley,* 593 A.2d 576, 582 (Del. Super. 1990).

### *(1) "Third-party" Consent*

First, the State contends that DSP were permitted to enter the Residence without a warrant pursuant to the "third-party" consent of Keisha's son, Alvin West. Mr. West testified, at a hearing on this matter, that he asked DSP to search the Residence in order to find his mother. Mr. West, thereafter, provided a key to DSP in order for police to conduct the search.

It is well-established that consent to search may be obtained from a third party. Actual third party authority to consent is established by possession and equal or greater control, *vis-a-vis* the owner, of the area searched.[26] Specifically, one who possesses common authority over property may validly consent as against an absent, non-consenting person with whom the authority is shared.[27] Common authority, as explained in *United States v. Matlock*, rests on:

> [m]utual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[28]

In the present case, the State urges the Court to find that Mr. West had common authority to consent to a search of the Residence because he maintained a bedroom

---

[26] *Scott v. State*, 672 A.2d 550, 552 (Del. 1996). In Delaware, the consenting party must have the "actual authority" to consent to a search, rather than mere "apparent authority," because, as explained in *State v. Devonshire*, the Delaware Constitution prohibits a search based on invalid consent. *State v. Devonshire*, 2004 WL 94724 (Del. Super. Jan. 20, 2004).

[27] *United States v. Matlock*, 415 U.S. 164, 170 (1974).

[28] *Id.* at 172, n.7.

15

at the Residence, he possessed a key to the Residence, and he was free to come and go as he pleased from the Residence. However, Mr. West's testimony also indicated that he was not currently living at the Residence at the time he requested DSP to conduct a search. Rather, he had been staying with Ms. Foster.[29]

The Supreme Court addressed a similar, yet distinguishable, issue in *Illinois v. Rodriguez*.[30] In *Rodriguez*, the defendant challenged his ex-girlfriend's authority to consent to a search of his apartment because she no longer lived with him.[31] The facts indicated that she moved out of the apartment a month prior to the search.[32] However, she still possessed a key to the apartment and kept some of her belongings there.[33] She also occasionally spent the night at the apartment, after she had already moved out.[34] Nevertheless, the Court determined that the ex-girlfriend did not have "joint access or control for most purposes" because she never went to the defendant's apartment unless he was there.[35] And, she never invited friends to the apartment.[36]

---

[29] The parties dispute how long Mr. West had been staying with Ms. Foster, but the Court presumes that it was for more than a few days.

[30] *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

[31] *Id.* at 181.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 181-82.

[36] *Rodriguez*, 497 U.S. at 181.

Thus, the ex-girlfriend did not have the common authority to permit police to search the defendant's apartment.[37]

The Court concedes that the facts in this case are similar to *Rodriguez*. For instance, like *Rodriguez*, Mr. West indicated that, despite leaving some his belongings at the Residence, he was no longer living there at the time he consented to the search by DSP. Instead, he was living with Ms. Foster. Nonetheless, this case is distinguishable from *Rodriguez* because the facts indicate that Mr. West was free to come and go from the Residence as he pleased. He also strongly denied that his access to the home had been restricted since moving in with Ms. Foster. This is in stark contrast to *Rodriguez*, where the ex-girlfriend did not stay at the apartment when the defendant was not at home. It is also significant that Mr. West still maintained a bedroom at the Residence, because it conveys some expectation that he had a right to be there.[38] In sum, since the facts indicate that Mr. West's access to the Residence and his bedroom was not restricted by either Keisha or the Defendant, the Court must hold that Mr. West had the "actual authority" to consent to DSP's search.

The Court's analysis on this issue, however, is not complete. The Court must also determine whether Mr. West's status as a minor had any effect on his ability to consent to a search of the Residence. The question is a matter of first impression within the State. After a thorough survey of the surrounding jurisdictions, the Court

---

[37] *See Id.* at 182.

[38] In fact, Mr. West's testimony seemed to indicate that he frequently moved back and forth between the Residence and Ms. Foster's as a result of his strained relationship with the Defendant. Nonetheless, his access to the Residence is buttressed by his possession of a key to the premises.

declines to adopt a bright-line rule on this issue because the Court recognizes, as the court in *State v. Tomlinson* recognized, that "there are some situations where a child could reasonably possess the authority to consent to a search, or to consent to police entry of a parent's home."[39]

*Tomlinson* held that courts must look at the "totality of the circumstances" to determine whether a child possesses such authority, including factors such as the "child's age, intelligence, and maturity, and the scope of the search or seizure to which the child consents."[40] *Tomlinson* also suggested that the court should consider "the extent to which the child has been left in charge, and the extent to which the parent has disclosed his or her criminality to the child."[41] However, according to *Tomlinson*, "age, intelligence, and maturity of the child are more important because, as a child gets older and more mature, the child will generally be entrusted with greater responsibility."[42] Finally, *Tomlinson* held that the scope of consent is important because "there are parts of the family's home where the parents have an increased privacy interest."[43]

The court in *United States v. Peden*, also declined to adopt a *per se* rule

---

[39] *State v. Tomlinson*, 648 N.W.2d 367, 376 (Wis. 2002).

[40] *Id.* (citation omitted).

[41] *Id.* at 377 (citation omitted).

[42] *Id.*

[43] *Id.*

18

regarding minors.[44] As in *Tomlinson*, the Court in *Peden* recognized that "as a child advances in age she acquires greater discretion to admit visitors on her own authority."[45] In addition, the court acknowledged that minors could consent to a search if the "search[] was made at the request of the child or when a child is the victim or a witness to a crime."[46]

In the present case, given Mr. West's age and the surrounding circumstances, it was reasonable for Mr. West to consent to DSP's entry into and subsequent search of the Residence. As in *Tomlinson*, Mr. West was a teenager when he permitted DSP to enter the Residence.[47] The *Tomlinson* court determined that a fifteen-year-old was old enough to permit police entry into a parent's home because, "[a] high school-aged child will likely have at least some authority to allow limited entry into the home."[48] Although Mr. West was technically fourteen at the time he consented to the search, the Court still finds that *Tomlinson* controls because Mr. West was almost fifteen when he consented to the search. And, there is no indication that as a fourteen-year-old, Mr. West's authority was more limited than the fifteen-year-old minor's authority in *Tomlinson*. Additionally, there was no evidence presented that Mr. West lacked

---

[44] *United States v. Peden*, 2007 WL 2318977 (E.D. Cal. 2007).

[45] *Id.* at *5.

[46] *Id.* (citing *People v. Jacobs*, 729 P.2d 757, 764 (Cal. 1987).

[47] *See Tomlinson*, 648 N.W.2d at 376-77.

[48] *Id.* at 377. *See, e.g., Doyle v. State*, 633 P.2d 306, 309 (Alaska Ct. App. 1981); *Mears v. State*, 533 N.E.2d 140, 142 (Ind. 1989); *State v. Folkens*, 281 N.W.2d 1, 4 (Iowa 1979); *State v. Griffin*, 756 S.W.2d 475, 484-85 (Mo. 1988).

the intelligence or maturity such that DSP's reliance on the consent would have been called into question.

Next, although Mr. West's consent to DSP's entry into the Residence exceeded that of the police entry in *Tomlinson*,[49] the Court is convinced that the surrounding circumstances permitted a more extensive entry and search by DSP. Mr. West's mother was missing, and Mr. West feared for her safety. It was reasonable, therefore, for him to permit DSP's entry into and search of common areas of the Residence in order to locate her.[50] The Court's conclusion is bolstered by the court's acknowledgment in *Peden* that a minor-child has the authority to consent to a search of a parent's home if the child requests the search.[51]

In sum, Mr. West had actual third-party authority to permit DSP's entry into the Residence to search for Keisha. Although Mr. West's authority was not unlimited, under the circumstances, it was reasonable for a fourteen-year-old to request that police search the common areas of his mother's home in order to locate

---

[49] *Tomlinson*, 648 N.W.2d at 377 (where the court held that the scope of police entry bolstered their conclusion that the officers reasonably relied on third-party consent of a minor-child because officers were only allowed into the entryway and kitchen of the parent's home).

[50] *See Jacobs*, 729 P.2d at 764 (acknowledging that, "[i]n some circumstances, a teenager may possess sufficient authority to allow the police to enter and look about common areas.") In this instance, a "common area" would include the upstairs hallway where pools of blood were discovered. DSP's search of the Defendant and Keisha's bedroom would not likely be considered a common area and would therefore exceed the scope of Mr. West's authority to consent. However, the search was justified under the "emergency doctrine" due to the increased concern for Keisha's safety after discovering large quantities of blood. The Court discusses the "emergency doctrine" more thoroughly in the Court's subsequent analysis below.

[51] *See Peden*, 2007 WL 2318977 at *5.

20

her.

### (2) The "Community Caretaker Doctrine"

Second, the State contends that DSP were permitted to enter the Residence without a warrant pursuant to the "community caretaker doctrine."[52] The State's reliance on the doctrine, however, is misplaced. The doctrine has never been applied to a warrantless search of a home. Rather, it has been exclusively applied to the seizure of an individual outside the home.[53] Therefore, the State's contention is without merit and the "community caretaker doctrine" does not apply under these circumstances.[54]

### (3) The "Emergency Doctrine"

Third, the State contends that DSP were permitted to enter the Residence without a warrant pursuant to the "emergency doctrine."

In order to demonstrate the legality of a warrantless search under the

---

[52] The doctrine, according to the Delaware Supreme Court in *Williams v. State*, "reflects that the role of police in Delaware is not limited to merely detection and prevention of criminal activity, but also encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens." *Williams v. State*, 962 A.2d 210, 218 (Del. 2008) (citation omitted).

[53] *See e.g., Moore v. State*, 997 A.2d 656 (Del. 2010); *State v. McDowell*, 2016 WL 6462143 (Del. Super. Oct. 31, 2016); *West v. State*, 2015 WL 5121059 (Del. Super. Aug. 20, 2015); *State v. Negron*, 2012 WL 2833004 (Del. Super. Jun. 28, 2012); *State v. Drain*, 2014 WL 12694572 (Del. Com. Pl. Mar. 14, 2014); *State v. Blake*, 2009 WL 3043964 (Del. Com. Pl. Sep. 14, 2009).

[54] Based on its reliance on *Blake v. State*, 954 A.2d 315 (Del. 2008), it is likely that the State confused the "community caretaking doctrine" with the "emergency doctrine." The State's confusion is understandable because the second prong of the "emergency doctrine" stipulates that, when officer's are conducting a warrantless emergency search of a home, the "officers must conduct the search primarily to achieve a community caretaking function, rather than to pursue a law enforcement objective." *Guererri v. State*, 922 A.2d 403, 407 (Del. 2007).

21

emergency doctrine, the State must show, by a preponderance of the evidence that:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[55]

A warrantless entry into and following search of a person's home does not violate the Fourth Amendment if this three-pronged test is satisfied.[56]

The Court's decision on this issue is guided by *People v. Bondi.*[57] In *Bondi*, the Illinois court found that a missing person's report was sufficient to satisfy the emergency doctrine.[58] Applying the three elements of the doctrine, the court held:

> (1) that the fact that [the victim] was reported missing gave the authorities reasonable grounds to believe that she may be in imminent danger of death or serious bodily harm, (2) that as such the primary intent of the search of the premises was to locate her and provide assistance to her, not to seize evidence against the defendant, and (3) that her residence and the property surrounding it were the most likely places to search for evidence of the whereabouts of a missing occupant.[59]

---

[55] *Guererri*, 922 A.2d at 406.

[56] *Id.*

[57] *People v. Bondi*, 474 N.E.2d 733, 736 (Ill. App. Ct. 1984).

[58] *Id.*

[59] *Id. See also People v. Eckhardt*, 761 N.Y.S.2d 338, 341 (N.Y. App. Div. 2003) (holding that the emergency doctrine justified a warrantless search to locate the victim because the victim: (1) was reported missing; (2) was reportedly depressed; (3) had problems with her boyfriend, against

22

In this case, as in *Bondi*, Keisha was reported missing. Ms. Foster informed police that she was concerned because she was unable to contact Keisha, or the Defendant, after receiving "alarming messages." Keisha reportedly feared for her safety and requested that Ms. Foster contact police if anything happened to her. Keisha also failed to appear for her shift at work.[60] Consequently, the first prong of the emergency doctrine is satisfied, as these facts indicate that Keisha was in danger and in need of assistance. The second prong of the doctrine is satisfied because the facts indicate that the primary intent of police was to locate Keisha and provide assistance to her, not to seize evidence against the Defendant. Finally, the third element of the emergency doctrine is satisfied because the Residence was the most likely place to search for evidence of the whereabouts of Keisha i.e. "a missing occupant."

Assuming *arrguendo* that the first two prongs of the emergency doctrine were satisfied, the Defendant contends that the third prong was not satisfied because the search exceeded the scope of what was necessary to determine whether or not there were occupants in the Residence. Although the Defendant has not cited any legal authority, it is likely that the Defendant relies upon *Guererri*. According to *Guererri*, there must be a "reasonable nexus between the emergency and the area

---

whom she had an order of protection; and (4) the victim's cat, of which she was very protective, had been left outdoors unattended).

[60] The Defendant indicated that he and his children had plans to leave Delaware on Monday, January 12, 2015, to visit family. Ms. Foster indicated to DSP, however, that Keisha did not intend to travel with the Defendant.

searched."[61] The search cannot be "unlimited or random, such as, for example, peering into drawers, cupboards or wastepaper baskets."[62] Instead, the search must be confined to those areas in which the police might find potential victims or a person presenting "further danger."[63] For instance, in *Guererri*, it was permissible for police to search the basement of the Defendant's house to look for anyone who was injured, after police responded to a 911 call reporting gunshots and the Defendant's home appeared to have been struck by shotgun pellets.[64]

In this case, as in *Guererri*, police searched the Residence, in order to locate a potential victim; i.e. Keisha. During the search of the Residence, police discovered large pools of blood, blood spatter and a knife in the second floor hallway and master bedroom. Like the basement in *Guererri*, it is reasonable for police to search these areas because Keisha could easily be located in either of them. Therefore, a sufficient nexus existed for the police to search the areas where the evidence was discovered.

The Court's finding that the search was proper also disposes of the Defendant's challenge to the field test of two blood stains. The Defendant concedes that the police discovered the blood in "plain view," but contests the field test of the blood. The Circuit Court in *United States v. Buchanan*, however, reiterated that "[t]he 'plain view' doctrine may also validate a warrantless *search* of an item, so long as the item

---

[61] *Guererri*, 922 A.2d at 408.

[62] *Id.*

[63] *Id.*

[64] *Id.*

could lawfully have been seized."[65] As the Defendant does not dispute that police could have *seized* the blood pursuant to the "plain view" doctrine, the field testing, or *search*, of the blood was also proper.

In sum, the warrantless search by DSP of the Residence was permissible pursuant to either the third-party consent of Mr. West or the emergency doctrine. Any evidence seized in plain view, therefore, is admissible.

## II. January 10, 2015 Residence Warrant

### a. Does the Defendant have Standing to challenge the search?

As previously explained, the Defendant has satisfied his burden to demonstrate standing to contest the search of the Residence.[66]

### b. Does an untimely filed "warrant return" invalidate an otherwise validly executed warrant?

The Defendant seeks to suppress evidence seized pursuant to the January 10, 2015 Residence Warrant because DSP failed to submit a timely inventory of the items seized during the execution of the warrant. The law is well-settled on this issue. In *Derrickson v. State*, this Court held that "merely filing the return late will not invalidate an otherwise legal search and seizure."[67] Therefore, the Defendant's contention is without merit.

---

[65] *United States v. Buchanan*, 70 F.3d 818, 825 (5th Cir. 1995). *See Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("It would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination.")

[66] *See* discussion *supra* pp. 11-12.

[67] *Derrickson v. State*, 321 A.2d 497, 501 (Del. 1974).

### *III. Indiana State Police's Seizure of the Defendant*

#### *a. Does the Defendant have standing to challenge his seizure by Indiana State Police?*

Generally, a person seized by police has standing to contest his or her seizure.[68] Therefore, the Defendant does have standing to contest his seizure by ISP.

#### *b. Did Indiana State Police Unlawfully Seize the Defendant?*

The Defendant's challenge of his seizure by ISP is two-fold. First the Defendant contends that the AMBER Alert issued by DSP, and subsequently relied upon by ISP, was improperly issued. Second, assuming that the Alert was properly issued, the Defendant contends that an AMBER Alert constitutes an insufficient basis for the Defendant's seizure.

The term "AMBER" means "America's Missing: Broadcast Emergency Response." An AMBER Alert is

> a voluntary partnership between law-enforcement agencies, broadcasters, transportation agencies, and the wireless industry, to activate an urgent bulletin in the most serious child-abduction cases. The goal of an AMBER Alert is to instantly galvanize the entire community to assist in the search for and the safe recovery of the child.[69]

In this case, the Defendant claims that DSP violated their own Media Alert Policy when they issued an AMBER Alert without credible information that his

---

[68] *United States v. Fuentes*, 182 F.3d 933, 1999 WL 311481, at *3 (10th Cir.1999) (TABLE).

[69] *See* U.S. Department of Justice: Office of Justice Programs, AMBER Alert: America's Missing Broadcast Emergency Response, *available at http//www.amberalert.gov* (last visited Oct. 11, 2017).

children were in danger. The Defendant claims that he was simply taking his children on a pre-planned trip to see family. Therefore, he claims the AMBER Alert should never have been issued. The Defendant's assertion is made without citation to any legal authority.

DSP's Media Alert Policy, as submitted into evidence, provides that an AMBER Alert will be issued when a child is abducted.[70] The Media Alert Policy defines abducted child as: (1) "[a]ny child . . . whose whereabouts are unknown;" (2) "[w]hose domicile at the time he or she was reported missing was Delaware;" (3) "[w]hose age at the time he or she was first reported missing was 17 years of age or younger, including a newborn;" and (4) "[w]hose disappearance poses a credible threat ***as determined by law enforcement*** to the safety and health of the child."[71] The language emphasized by the Court is important in this instance. The police, not the Court, determines if a child's disappearance poses a credible threat to the child's safety and health. The Court, therefore declines to second guess DSP's determination in this case.

Next, in regards to whether an AMBER Alert can provide a sufficient basis for police to conduct a traffic stop, the Court relies on *United States v. Resa*.[72] According to *Resa*, an AMBER Alert can serve to justify at least a brief investigatory

---

[70] *See* Appendix of the Opinion for the full text of the Delaware State Police Media Alert Policy.

[71] *Id.*

[72] *United States v. Resa*, 552 F.Supp.2d 720, 727 (E.D. Tenn. 2008).

27

traffic stop in the same manner as a be-on-the-lookout (BOLO) notice to law enforcement.[73]   Whether a BOLO report provides a sufficient basis for an investigatory stop depends upon:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity, or has instead gone stale.[74]

Here, there is no indication that Ms. Foster was unreliable. She was merely concerned for her sister and expressed those concerns to DSP. Likewise, the AMBER Alert in this case was sufficiently specific. The alert described the missing children, as well as the Defendant, since DSP believed the children may be with him. ISP also indicated that they were given a description of the Suburban the Defendant was driving. ISP corroborated this information when they confirmed that the Suburban's license plate number matched the number provided by DSP. Furthermore, ISP confirmed the identity of the Defendant once he exited the Suburban. Finally, it is apparent that the information in the AMBER Alert had not gone stale because it was only issued earlier that day, and the children still had not been found. The Court concludes, therefore, that the information provided in the AMBER Alert was sufficiently reliable and specific to support a minimally intrusive *Terry* stop of the Suburban.

---

[73] *Id.*

[74] *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir.1999).

### IV. Indiana State Police's Search of the Suburban

In addition to the contesting his seizure by ISP, the Defendant contests ISP's subsequent search of the Suburban. According to the Defendant, ISP lacked probable cause to search the Suburban. The Defendant also contends that ISP's search of the Suburban exceeded the scope of the warrant.

#### a. Does the Defendant have standing to challenge the search of the Suburban?

As the Court previously explained, a defendant carries the burden of demonstrating standing to challenge a search and seizure.[75] Standing will be found if a defendant sufficiently demonstrates that he "has a legitimate expectation of privacy in the invaded place."[76]

In this case, the Defendant has not satisfied his burden under Rule 41(f) to allege standing in the Suburban. He failed to provide, in either his motions to suppress or at the hearing on the matter, a single factual or legal basis to demonstrate his interest in the vehicle.[77] As the Defendant has neglected his obligation, further consideration of this issue is not required. Nevertheless, the Court acknowledges that

---

[75] *Righter,* 704 A.2d at 265; *see Salvucci,* 448 U.S. at 90-91.

[76] *Rakas,* 439 U.S. at143; *Thomas,* 467 A.2d at 958.

[77] The Defendant's burden under Rule 41(f) is not relieved by his prior submission of the Suburban's registration card to the Court in support of the Defendant's Motion for Return of Property, D.I. No. 12. At a minimum, the Defendant should have referenced the registration, listing the Defendant as the registered owner of the Suburban, in his subsequent motion to suppress. As the Defendant did not reference the vehicle's registration, nor did he provide the vehicle's title to the Court, the Court finds that the Defendant failed to sufficiently plead standing under Rule 41(f).

it is necessary, under the circumstances, to reach the merits of the Defendant's contentions.

### b. Was ISP's warrant to search the Suburban sufficiently supported by probable cause?

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[78]

The threshold requirement for issuance of a warrant is probable cause.[79] In reviewing a search warrant application, a magistrate must consider whether, considering all of the circumstances described in the affidavit, sufficient evidence has been presented that demonstrates that there is a "fair probability" that evidence of the crime will be located before validating a warrant.[80] Probable cause is a "fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."[81]

After a search warrant has been issued and is challenged on the basis of probable cause, the reviewing court must determine whether the judicial officer had

---

[78] U.S. Const. Amend. IV.

[79] *Illinois v. Gates*, 462 U.S. 214, 236 (1983).

[80] *Id.* at 238.

[81] *Id.* at 232.

a "substantial basis" for finding probable cause.[82] The decision of the issuing officer should be afforded great deference.[83] The reviewing court should avoid "interpreting affidavits in a hyper-technical, rather than a common sense manner."[84] In so doing, the court must confine itself to only the affidavit and cannot consider other portions of the record.[85] When resolving questionable cases, the deference accorded warrants should prevail.[86] Moreover, direct evidence linking the place to be searched with a crime is not required for a warrant to issue.[87] Rather, "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and normal inferences about where a criminal might hide" the items sought.[88]

The affidavit of probable cause to search the Suburban, states *in toto*:

> TOBIAS ODOM, being a Detective with the Indiana State Police, after having first been duly sworn upon his oath, swears that he believes and has good and probable cause to believe that property constituting fruits, instrumentalities and evidence of the Delaware crimes of ASSAULT SECOND DEGREE RECKLESS INTENTIONAL SERIOUS INJURY,

---

[82] *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).

[83] *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002).

[84] *Gates*, 462 U.S. at 236 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

[85] *Hodge*, 246 F.3d at 305.

[86] *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

[87] *Id.* at 1056.

[88] *Id.*

ENDANGERING THE WELFARE OF A CHILD (two counts) will be located, said evidence being more particularly described as follows:

Blood, human remains, clothing, cell phones and or bodily fluids that may be found in the vehicle driven by CORTEZ HAMILTON, SR; and to preserve the same from this vehicle.

These items are believed to be in the vehicle driven by CORTEZ HAMILTON, SR, who has a date of birth of December 24, 1982 and whose Social Security Number is xxx-xx-xxxx and who's last known address was 113 E. Cayhill Lane, Smyrna, DE 19977. CORTEZ HAMILTON, SR is a black male, approximately 6'0", 195 pounds, with brown hair, brown eyes, and who is currently detained in the Warrick County Jail. The vehicle is more particularly described as a Red Chevrolet Suburban, License Number PC 121071, VIN Number 1GNEC16Z45R177427, and which vehicle is currently in the custody of the Indiana State Police at the Evansville, Indiana Post.

Your affiant bases his belief on the following:

On January 10, 2015, Det. Brad Cieslack, with the Indiana State Police department was contacted by law enforcement officials associated with the Delaware State Police. Det. Cieslack was informed that there were three missing individuals, [sic] four year old, Colete Hamilton (dob 12/29/2010), two-month old Cortez Hamilton, Jr. (dob unknown), and Keisha S. Hamilton (dob 10/15/1979), the children's mother. The children were believed to be traveling in the company of Cortez Hamilton, Sr. in a red 2005 Chevy Suburban.

Members of the Delaware State Police informed your affiant that there is sufficient evidence to believe that Keisha Hamilton was seriously wounded and/or killed in their residence in Smyrna, Delaware. On Friday, January 9, 2015, Keisha Hamilton contacted her sister, Janell Foster via text message. The text message further advised for Ms.

32

Foster to tell the police about Cortez Hamilton, Sr. Approximately 10 minutes after receiving the text, Ms. Foster talked to Ms. Hamilton on the phone, and Ms. Hamilton indicated that Cortez Hamilton, Sr. was acting strangely, and that she, Ms. Hamilton feared for her safety. This call lasted about five minutes, Janell Foster later determined that she had missed a phone call from Keisha Hamilton at about 10:44 p.m.

On Saturday, January 10, 2015, Ms. Foster attempted to contact Ms. Hamilton via telephone on numerous occasions. These attempts were unsuccessful. Ms. Foster went to the Hamilton's residence at 113 Cayhill Lane, Smyrna, DE but was unable to make contact with anyone at the residence. She also attempted to contact Cortez Hamilton, Sr. by phone, but received no answer.

On January 10, 2015, Keisha Hamilton was scheduled to work a shift at a Food Lion. Ms. Foster called to see if she had made it in to work. The manager indicated that she was not there, and that he was concerned that she was absent, as this was abnormal regarding Keisha.

On Saturday, January 10, 2015, Ms. Foster called 911 at about 10:05 a.m. to report her sister missing. Corporal Hennon and Trooper Huynh responded to Janell Foster's residence. Ms. Foster advised that Keisha and Cortez were having marital difficulties. She further stated that Keisha had moved back in the marital home approximately one week ago.

On January 10, 2015, Corporal Hennon, Corporal Harach and Trooper Hyunh responded to 113 Cayhill Lane, Smyrna, Delaware to complete a welfare check on Keisha Hamilton. They were unable to make contact with anyone inside the residence after numerous attempts. They were then provided a key to the residence by Avin [sic] West, Keisha Hamilton's fourteen year old son, who resides with Foster. In checking the residence, there was a large amount of blood in the common upstairs hallway. In addition, there was blood splatter [sic] on the walls and a

33

large amount of blood in what appeared to be the master bedroom. Also in this bedroom, was additional splatter [sic] on the walls, and bloody footprints near the master bathroom. A portion of the blood in the hallway was covered by two large, black towels/blankets and one large white towel/blanket. In addition, troopers located a large butcher knife in plain view resting on the carpet in the master bedroom.

On January 10, 2015, Detective Daddio responded to the residence 113 Cayhill Lane, Smyrna, DE. At this time, he performed ABA Card HEMA TRACE kit to test two of the blood stains for human blood. These results were positive. According to Det. Daddio and Det. Cresto, there was a significant blood loss that would lead one to believe that an individual had sustained serious and/or life threatening injuries. Detective Cresto and Daddion [sic] also verified the presence of human blood through a luminal examination.

On January 10, 2015, numerous attempts have been made to contact both Cortez Hamilton, Sr. And Keisha Hamilton via cellphone without success. On January 10, 2015, Det. Anderson of the Delaware State Police located an abandoned silver Toyota Matrix, with temporary Delaware license plates, XP219435, in a parking lot located behind Atlantis Homes. This car was found to be registered to Keisha Hamilton. Anderson advised a purse was resting on the front passenger floorboard. The purse and accompanying cell phone were later determined to belong to Keisha Hamilton.

Authorities immediately issued an Amber alert for the missing children. On January 10, 2015, your affiant was informed that a car matching the description of the Amber alert had been stopped along Interstate 64, at mile marker 37 in the County of Warrick, State of Indiana. Contact was made with the vehicle, and the driver was found to be Cortez Hamilton, Sr. The passengers in the car were Collette Hamilton, and Cortez Hamilton, Jr.

Your affiant speaks from personal knowledge and observation and believes that individuals providing information speak from personal knowledge and observation and are reliable and credible in that they voluntarily relayed that above information to your affiant during the course of your affiant's duties as a Law Enforcement Officer in an effort to aid in the investigation of this offense.

WHEREFORE, your affiant believes and has good and probable cause to believe that the above described property constituting fruits, instrumentalities and evidence of the aforesaid crime of Delaware crimes of ASSAULT SECOND DEGREE RECKLESS INTENTIONAL SERIOUS INJURY, ENDANGERING THE WELFARE OF A CHILD (two counts) are being concealed in or about the above described person of Warrick, State of Indiana.

Applying the standard previously set forth to the instant facts, the Court finds that the affidavit of probable cause provided by ISP, when examined in its totality and tested in a common-sense way, provided sufficient probable cause for a warrant to search the Suburban. Specifically, the Court holds that probable cause existed to believe that: (1) the Defendant assaulted Keisha; and (2) the Suburban contained evidence of that assault.

First, in regards to the assault, the affidavit indicates that Keisha informed Ms. Foster that she feared for her safety because the Defendant was "acting strangely." Keisha thereby requested that Ms. Foster contact police if anything happened to her. The very next day, DSP discovered large pools of blood and blood spatter at the Residence. The logical inference of these facts is that the Defendant assaulted Keisha, resulting in life-threatening injuries and massive blood loss.

Second, in regards to evidence of the assault being located in the Suburban, the

35

affidavit indicates that Ms. Foster, and DSP, attempted to contact the Defendant on numerous occasions prior to the Defendant's arrest by ISP. The logical inference of the Defendant's failure to respond, combined with evidence of Keisha's assault and ISP's discovery of the Defendant in Indiana, is that the Defendant was fleeing Delaware in the Suburban. Therefore, the likelihood of the Defendant transporting evidence of Keisha's assault in the Suburban is significant.

### c. Did ISP's search of the Suburban exceed the scope of the warrant?

The warrant executed by ISP permitted the search and seizure of: "clothing, blood, bodily fluids and/or human remains, cell phones, and GPS devises [sic], that are believed to be in the vehicle." At the hearing on this matter, the State established that ISP seized from the Suburban, among other things: various clothing and towels from numerous trash bags, duct tape, a wallet containing Keisha's driver's license, Toyota car keys, a bloody hammer, a locket of hair, cellphones, the Suburban's gas pedal, and the Suburban's brake pad. The Defendant contends that the Court should suppress all of the items seized by ISP that were not specifically identified in the warrant. The Court finds that all of the items, except for the Suburban's brake pad and gas pedal, are admissible because the officer performing the search indicated that blood was present on the items or within the same bag as the items. However, according to the ISP officer, there was no indication that blood was present on the Suburban's brake pad or gas pedal.[89] Therefore, these two items are inadmissible.[90]

---

[89] The ISP officer testified that he seized the brake pad and gas pedal because blood or fibers *may* have been present. The officer also admitted, however, that he did not observe any blood or fibers. He also did not perform any presumptive tests on the two items. Therefore, he was unsure

### V. Delaware State Police Search of the Toyota Matrix

According to the Defendant, DSP lacked probable cause to search the Toyota Matrix. The Defendant also contends that the affidavit of probable cause to search the vehicle fails to demonstrate how the vehicle contained evidence or instrumentalities of a crime. Finally, the Defendant contends that DSP's search of the Toyota Matrix exceeded the scope of the warrant.

#### a. Does the Defendant have Standing to contest DSP's search of the Toyota Matrix?

The Defendant alleges that he has standing to contest the search of the Toyota Matrix because it constitutes "marital property." This statement, however, is a legal conclusion rather than a legal argument because, even if the vehicle constitutes marital property, the Defendant has not provided any factual or legal grounds to demonstrate than an interest in marital property alone is sufficient to confer standing to challenge the search of the property. The Court is also unaware of any authority that would support the Defendant's proposition.[91] Therefore, the Defendant has failed to satisfy his burden under Rule 41(f) to allege standing. Nevertheless, the Court

---

as to whether the brake pad and gas pedal actually contained trace evidence of blood or fibers.

[90] The "plain view" doctrine is inapplicable under these circumstances because there was no indication that the "incriminating character" of the Suburban's brake or gas pedal was "immediately apparent." *Moore v. State*, 997 A.2d 656, 668 (Del. 2010).

[91] In *United State v. Jones*, Justice Alito observed in his concurring opinion that "[i]n non-community-property States . . ., the registration of the vehicle in the name of [a defendant's] wife would generally be regarded as presumptive evidence that she was the sole owner." *United State v. Jones*, 565 U.S. 400, 426 (2012). Delaware is a non-community-property state. *See Frank G.W. v. Carol M.W.*, 457 A.2d 715, 724 (Del. 1983).

acknowledges that it is necessary, under the circumstances, to reach the merits of the Defendant's contentions.

### *b. Was the warrant to search the Toyota Matrix sufficiently supported by probable cause?*

Like the United States Constitution, under the Delaware Constitution, "a search warrant may be issued only upon a showing of probable cause."[92] Delaware constitutional requirements for search warrants are codified in Title 11, Sections 2306 and 2307 of the Delaware Code. Pursuant to Section 2306, the application for a search warrant must "state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated [in the search warrant application] and shall recite the facts upon which suspicion is founded."[93] Under Section 2307, a warrant may issue only upon a judicial determination of probable cause.[94]

---

[92] U.S. Const. Amend. IV; Del. Const. art. I, § 6; *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).

[93] 11 *Del. C.* § 2306 (2001) ("The application or complaint for a search warrant shall be in writing, signed by the complainant and verified by oath or affirmation. It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which suspicion is founded.").

[94] 11 *Del. C.* § 2307 (2001) ("If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, that person may direct a warrant to any proper officer or to any other person by name for service. The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons

Delaware courts engage in a four-corners test to make a probable cause determination.[95] Within the four-corners of the search warrant affidavit, the document must present sufficient facts for a judge or magistrate to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place.[96]

When determining whether probable cause to obtain a search warrant exists, the Court will apply a totality of the circumstances test.[97] This analysis allows a judge or magistrate to draw reasonable inferences from the factual allegations within the affidavit.[98] As such, probable cause may exist under the totality of the circumstances where "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[99] Such a nexus need not be based on direct observation or facts placing evidence at the location to be searched and may be inferred from the factual circumstances, including, the type of crime, the nature of the items sought, the extent

---

sought as particularly as possible, and may be returnable before any judge, justice of the peace or magistrate before whom it shall also direct to be brought the person or thing searched for if found, and the person in whose custody or possession such person or thing is found, to be dealt with according to law.").

[95] *Sisson*, 903 A.2d at 296.

[96] *Id.* (citing 11 *Del. C.* § 2306; *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000)).

[97] *Id.* (citing *Fink v. State*, 817 A.2d 781, 787 (Del. 2003)). *See also Gardner v. State*, 567 A.2d 404 (Del. 1989).

[98] *Id.*

[99] *Id.* (citing *Stones v. State*, 1996 WL 145775, at *2 (Del. 1996) (ORDER) (quoting *Gates*, 462 U.S. at 238)).

of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime."[100]

While the four-corners test "restricts the scope of a reviewing courts inquiry," the Court is still permitted to use common sense in its analysis.[101] This allows the Court to avoid a hypertechnical approach when reviewing a search warrant.[102] Moreover, the Court must give great deference to the judge or magistrate who initially finds probable cause to issue a search warrant.[103] But, the Court must still determine whether the information provides the judge or magistrate with a substantial basis to find probable cause.[104]

The affidavit of probable cause to search the Toyota Matrix states in part:

> 1. Your Affiant is Sergeant Jeremiah Lloyd. Affiant Lloyd is a Delaware State Trooper who has been employed by the Delaware State Police since September 2005. Affiant Lloyd is currently assigned to the Troop 3 Criminal Investigations Unit and has been since March 2014. . . .
>
> 2. The target of this investigation is Cortez Hamilton. . . . Cortez Hamilton is the husband of Keisha Hamilton . . . .

---

[100] *See State v. Ivins*, 2004 WL 1172351, at *4 (Del. Super. May 21, 2004) (quoting *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999)).

[101] *See State v. Holton*, I.D. No. 1101000487, 2011 WL 4638781, at *3 (Del. Super. Sep. 22, 2011).

[102] *Id.*

[103] *Sisson*, 903 A.2d at 296

[104] *Holton*, 2011 WL 4638781, at *3.

3. Your Affiant brings to this Honorable Court probable cause that Keisha Hamilton is currently a missing adult with potential life threatening injuries. The location of Cortez Hamilton . . ., Cortez Hamilton Jr., and Collette Hamilton are currently unknown.

4. On Friday, January 9, 2015, Keisha Hamilton contacted her sister, Janell Foster . . ., via text message. The text message advised for Janell Foster to contact police if anything happened to Keisha Hamilton. The text message further advised to tell police about Cortez Hamilton. Approximately ten minutes after receiving the text message Janell Foster contacted Keisha Hamilton in regards to the text message. Janell Foster spoke with Keisha Hamilton on the telephone. Keisha Hamilton told Janell Foster that Cortez Hamilton was acting very strange and she was concerned for her safety. Janell Foster advised the conversation lasted approximately five minutes. Janell Foster had a missed call at approximately 2244 hours from Keisha Hamilton.

5. On Saturday, January 10, 2015, Janell Foster noticed the missed call from Keisha Hamilton. Janell Foster attempted to contact Keisha Hamilton via telephone on numerous occasions and had negative results. Janell Foster responded to the residence, at approximately 0930 hours, located at 113 East Cayhill Lane, Smyrna, Kent County, Delaware in an attempt to make contact with her. Janell Foster advised the residence was located and no vehicles were present. Janell Foster advised the residence appeared to be unoccupied. Janell Foster then responded back to her residence . . . . Additionally, Janell Foster attempted to contact Cortez Hamilton's cellular telephone . . . and had negative results.

6. On Saturday, January 10, 2015, Keisha Hamilton was scheduled to work at a Food Lion located in Millington, Maryland. Janell Foster contacted a manager at the store to ascertain if Keisha Hamilton arrived for work. The manager advised Keisha Hamilton was not at work and he was alarmed she did not show up for work. The manager advised Janell Foster he was alarmed because this is abnormal behavior for

Keisha Hamilton.

7. On Saturday, January 10, 2015, at approximately 1005 hours, Janell Foster calls 911 to report Keisha Hamilton missing. Corporal Hennon and Trooper Huynh responded to Janell Foster's residence. Janell Foster advised Keisha Hamilton and Cortez Hamilton have been experiencing marital problems. Janell Foster advised Keisha Hamilton moved back in with Cortez Hamilton approximately one week ago. Janell Foster further advised Keisha Hamilton's son, Avin [sic] West . . ., currently resides with her . . . . Janell Foster advised Avin [sic] West does not get along with Cortez Hamilton. Janell Foster advised Avin [sic] West has been living with her since approximately 12/25/2014. Avin [sic] West had a key to the residence located at 113 E. Cayhill Lane, Smyrna, Delaware. Janell Foster further advised responding Troopers that Cortez Hamilton, Collette Hamilton, and Cortez Hamilton Jr. had travel arrangements to leave the region in the next couple of days.

8. On Saturday, January 10, 2015, Corporal Hennon, Corporal Harach, and Trooper Huynh responded to 113 E. Cayhill Lane, Smyrna, Delaware in an attempt to check on the well-being of Keisha Hamilton. Janell Foster and Avin [sic] West accompanied the responding Troopers to the aforementioned residence. Corporal Hennon knocked on the door and rang the doorbell multiple times with negative results. Responding Troopers checked the exterior of the residence and had negative results. Avin [sic] West then provided a key to the residence and entry was made to check on the safety of Keisha Hamilton and her children.

9. On Saturday, January 10, 2015, Troopers responded into the residence. Upon checking the second floor of the residence there was a large amount of blood in the common upstairs hallway. In addition, there was blood splatter [sic] on the walls and a large amount of blood in what appeared to be the master bedroom. Also in the master bedroom was additional blood splatter [sic] on the walls and bloody foot prints near the master bathroom. A portion of the blood in the hallway was

covered by two large black towels/blankets and one large white towel/blanket. A portion of the blood in the bedroom was covered by a large white towel/blanket. In addition, Troopers located a large butcher knife in plain view resting on the carpet in the master bedroom.

10. On Saturday, January 10, 2015, Detective Daddio, Detective Anderson, Lt. Fisher and your Affiant responded to the residence located at 114 E. Cayhill Lane, Smyrna, Delaware. Your Affiant and Lt. Fisher were briefed by Corporal Hennon and Detective Daddio. Detective Daddio performed ABA CARD HEMA TRACE kit to test two of the blood stains for the presence of human blood. The test resulted in a positive result for human blood.

11. Affiant Lloyd conducted a DELJIS inquiry on Cortez Hamilton and Keisha Hamilton. The inquiry revealed neither has prior criminal convictions within the State of Delaware.

12. Affiant Lloyd conducted a PFA inquiry through DELJIS and it revealed there were numerous PFA's where Cortez Hamilton was the respondent and Keisha Hamilton was the petitioner. The most recent PFA Order (0078718) expired on February 26, 2014.

13. On January 10, 2015 numerous attempts have been made to contact both Cortez Hamilton and Keisha Hamilton via cellular telephone with negative results. Both common children, Collette Hamilton and Cortez Hamilton Jr., are also unaccounted for.

14. Delaware State Police personnel have maintained the scene since the initial safety sweep of the residence located at 113 E. Cayhill Lane, Smyrna, Kent county, Delaware.

15. On January 10, 2015, Detective Anderson of the Delaware State Police located an abandoned silver Toyota Matrix bearing Delaware Temporary registration XP219435 in a parking lot located behind

Atlantis Homes, Village Square, Smyrna, Kent County, Delaware. A DELJIS inquiry revealed the 2010 Toyota Matrix, VIN: 2T1KE4EE9AC039702, registered to Keisha Hamilton of 113 E. Cayhill Lane, Smyrna, Delaware.

16. Your Affiant spoke to Detective Anderson via telephone and he advised the vehicle appeared to be unoccupied. Detective Anderson advised a pocket book was resting on the front passenger floor board. Detective Anderson remained with the vehicle.

17. Your Affiant observed the residence located at 113 East Cayhill Lane, Smyrna, Kent County, Delaware . . . .

18. Based upon the information contained herein, your Affiant believes that there is probable cause to believe that a significant assault occurred within the residence located at 113 E. Cayhill Lane, Smyrna, Kent County, Delaware. All parties that reside at the residence are unaccounted for. In addition, a 2010 Toyota Matrix bearing Delaware Temporary registration XP219435, VIN: 2T1KE4EE9AC039702, registered to Keisha Hamilton of 113 E. Cayhill Lane, Smyrna, Delaware was located unoccupied in the rear parking lot of a business located in close proximity to the aforementioned residence. Furthermore, your Affiant believes evidence located within the 2010 Toyota Matrix bearing Delaware Temporary registration XP2193435, VIN: 2T1KE4EE9AC039702 can assist in locating any potential evidence and/or victims of an assault. Furthermore, your Affiant believes that evidence relating to the assault can be located in the 2010 Toyota Matrix bearing Delaware Temporary registration XP2193435, VIN: 2T1KE4EE9AC039702. Your Affiant has clearly linked the aforementioned subject(s) to the residence and property stated to be searched through motor vehicle records and family members, and is requesting a search warrant be issued in this matter, for any and all evidence located resulting from the assault that occurred.

44

Applying the standard previously set forth to the instant facts, the Court finds that the affidavit of probable cause provided by DSP, when examined in its totality and tested in a common-sense way, provided sufficient probable cause for a warrant to search the Toyota Matrix. Specifically, the Court holds that probable cause existed to believe that: (1) Keisha disappeared under violent circumstances; and (2) the Toyota Matrix contained evidence of her assault and disappearance.

First, in regards to Keisha's assault and disappearance, the affidavit indicates that Ms. Foster was unable to locate Keisha after Keisha informed Ms. Foster that she feared for her safety because the Defendant was "acting very strange." DSP were also unable to locate Keisha when they searched the Residence. Instead, DSP discovered a large amount of blood and blood spatter at the Residence, indicating that someone had suffered a significant injury due to an assault. The logical inference of these facts is that the Defendant assaulted, and possibly killed, Keisha. The Court's inference is bolstered by information that Keisha had previously obtained numerous Protection From Abuse orders against the Defendant. As Ms. Foster indicated that the couple was currently experiencing marital difficulties, the likelihood of a domestic dispute was probable.

Second, as to the Toyota Matrix containing evidence of Keisha's assault and disappearance, the affidavit indicates that it was abandoned behind a local business, near the Residence. Under the circumstances, the normal inference is that the vehicle was intentionally placed behind the business in order to hide evidence of Keisha's assault and disappearance. In addition, since the Toyota Matrix was registered in Keisha's name, and Keisha was still missing at the time DSP applied for a warrant,

45

the Court finds that probable cause existed to search the vehicle because it is reasonable to believe that evidence of an individual's disappearance would likely be discovered in that individual's vehicle.[105]

In sum, the Court holds that probable cause existed to believe that evidence of Keisha's disappearance would be found in her Toyota Matrix.

### c. Did DSP's search of the Toyota Matrix exceed the scope of the warrant?

The warrant to search the Toyota Matrix permitted DSP to seize the following:

> Any and all trace evidence, blood, DNA, and/or hair samples. Any and all bloody clothing or clothing associated with an assault. Any weapons including but not limited to firearms, cutting instruments, blunt objects, and/or any other weapon that could be utilized in an assault. Any cellular telephones, electronic communication devices, and/or other communication devices belonging to Keisha Hamilton and/or Cortez Hamilton. Any paperwork indicating travel documents by Keisha Hamilton and/or Cortez Hamilton. Video and photographs of the vehicle, property, and crime scene.

used or intended to be used for:

> An assault on a human being where a large amount of blood was lost from the victim.

The Defendant contends that DSP seized items outside the scope of the warrant to search the Toyota Matrix. Specifically, the Defendant challenges DSP's seizure of two rolls of duct tape and specimens of dirt from the brake pedal and shifter knob.

---

[105] The facts also indicate that, prior to obtaining a warrant to search the Toyota Matrix, DSP observed a purse in the vehicle. Although DSP could not determine definitively, prior to the search, if the purse belonged to Keisha, the Court finds that such an inference does not exceed the bounds of logic.

The Court holds that the items must be suppressed. The dirt is inadmissible because, although it could constitute trace evidence, the facts do not indicate how specimens of dirt had anything to do with Keisha's assault. The duct tape is inadmissible because it does not fall within any of the categories of items that are permissibly seizable under the warrant, and the facts do not indicate how duct tape had anything to do with Keisha's assault. Therefore, the challenged evidence must be suppressed.[106]

## VI. *January 15, 2015 Residence Warrant*

The Defendant challenges the January 15, 2015 Residence Warrant on three grounds. First, the Defendant alleges that items requested in the January 15, 2015 Residence Warrant could have been readily ascertained and requested in the January 10, 2015 Residence Warrant. Second, the Defendant contends that items seized pursuant to the January 15, 2015 Residence Warrant exceeded the scope of the permissible search. Third, the Defendant asserts that the warrant returns were submitted late. Thus, as a result of the foregoing, the Defendant seeks to suppress any and all evidence discovered during the execution of the January 15, 2015 Residence Warrant.

### a. *Does the Defendant have Standing to challenge the search?*

As previously explained, the Defendant has satisfied his burden to demonstrate

---

[106] The "plain view" doctrine is inapplicable under these circumstances because there was no indication that the "incriminating character" of the dirt or duct tape was "immediately apparent." *Moore v. State*, 997 A.2d 656, 668 (Del. 2010).

standing to contest the search of the Residence.[107]

### b. Was it permissible to issue the warrant?

In *Commonwealth v. Bruno*, the court explained that "it would be unreasonable to allow the police to search the same premises repeatedly for the same contraband on only one showing of probable cause."[108] "Thus, if a prior search has occurred, the police must present sufficient additional information to the magistrate to support a probable cause showing that the contraband remains in or has recently been moved to the premises despite the previous search."[109] The court in *Bruno* permitted a second search of the defendant's room because the "the police gained additional physical evidence, which was presented to the magistrate," and a "more thorough search was necessary."[110]

In this case, like *Bruno*, DSP requested another opportunity to search the Residence based on additional evidence obtained by ISP. ISP discovered a bloody hammer, bloody clothing belonging to Keisha, clothing and shoes belonging to the Defendant – which were partially covered with mud and stained blood – and various personal items belonging to Keisha, including her wedding ring, a lock of her hair, her purse, and a cell phone. This evidence, according to Delaware police, indicated that Keisha may have been murdered. The evidence also indicated how her body may

---

[107] *See* discussion *supra* pp. 11-12.

[108] *Commonwealth v. Bruno*, 352 A.2d 40, 45-6 (Pa. 1976).

[109] *Id.* at 46.

[110] *Id.*

have been disposed of. Consequently, police requested an opportunity to conduct a more thorough search of the Residence.

The Court, following *Bruno*, finds that a subsequent search was permissible under the circumstances. Although the blood discovered during the initial search of the Residence indicated that someone, possibly Keisha, may have been badly injured, it wasn't until ISP reported the results of their search, that DSP had a fuller picture of what may have transpired. Armed with this new information, it should be self-evident that police would search the Residence with an eye towards collecting additional evidence that they may have not considered before. Therefore, under these circumstances, it was permissible to issue the January 15, 2015 Residence Warrant.

*c. Did DSP's search of the Residence exceed the scope of the January 15, 2015 Residence Warrant?*

The January 15, 2015 Residence Warrant permitted DSP to seize:

1. Any and all trace evidence to include but not be limited to blood, hair, fibers, fluids and fingerprints.
2. Any and all blood stained clothing, articles or objects.
3. Photographs and video of the above location.
4. Any and all electronic devices capable of storing electronic information to include but not limited to cellular telephones, video cameras, still cameras and computers and the contents thereof.
5. Any and all paperwork or articles that would provide insight into the motive for or the circumstances surrounding the disappearance of Keisha Hamilton.
6. Any and all dangerous weapons or instruments that may have been used in the disappearance of Keisha Hamilton.
7. Any item that may have been used to dispose of a body.
8. Any type of soil sample located at the residence.

49

The warrant return indicates that DSP seized the following during the execution of the January 15, 2015 Residence Warrant: molding from a hallway bathroom door; swabbing from a bathroom door; a fitted sheet from the master bedroom bed; lower trim of a dresser; drywall from the hallway; three drawer fronts from a dresser drawer; and a box containing trash bags. DSP testified that the trash bags were seized because trash bags can be used to dispose of a body. All of the other items were seized because blood stains were present. As the Court fails to recognize how any of these items would not fit within the permissible scope of the warrant, the Defendant's claims are without merit. Thus, the items will not be suppressed.

### d. Does an untimely filed "warrant return" invalidate an otherwise validly executed warrant?

As the Court previously explained, the law is well-settled as to whether an untimely filed warrant return invalidates an otherwise validly executed warrant. Specifically, in *Derrickson*, this Court held that "merely filing the return late will not invalidate an otherwise legal search and seizure."[111] Therefore, the Defendant's contention is without merit.

### VII. February 13, 2015 Warrant

In regards to the February 13, 2015 Warrant, the Defendant's only contention is that the warrant must be suppressed because the warrant return was filed late. As the Court has previously explained, late filed warrant returns do not invalidate an

---

[111] *Derrickson,* 321 A.2d at 501.

otherwise legal search and seizure. Therefore, the Defendant's contention is without merit.

## CONCLUSION

In sum, the Court holds:

The Defendant's request to suppress evidence discovered by DSP during the initial warrantless entry of the Residence on January 10, 2015, is **DENIED.**

The Defendant's request to suppress evidence discovered by DSP during the warranted search of the Residence on January 10, 2015, is **DENIED.**

The Defendant's request to suppress evidence as a result of ISP's seizure of the Defendant on January 10, 2015, is **DENIED.**

The Defendant's request to suppress evidence discovered by ISP's during the warranted search of the Suburban, on January 11, 2015, is **GRANTED** in part and **DENIED** in part. Specifically, the Suburban's brake pad and gas pedal are inadmissible. All of the other evidence discovered during the search is admissible.

The Defendant's request to suppress evidence discovered by DSP during the warranted search of the Toyota Matrix, on January 11, 2015, is **GRANTED** in part and **DENIED** in part. Specifically, the duct tape and soil samples seized by DSP are inadmissible. All of the other evidence discovered during the search is admissible.

The Defendant's request to suppress evidence discovered by DSP during the warranted search of the Residence on January 15, 2015, is **DENIED.**

*State v. Cortez A. Hamilton, Sr.*
I.D. No. 1501012432 WLW
October 12, 2017

The Defendant's request to suppress evidence discovered by DSP during the warranted search of the Residence and Suburban on February 13, 2015, is **DENIED.**

IT IS SO ORDERED.

_____
Hon. William L. Witham, Jr.
Resident Judge

WLW/dmh

52